[No. S014775. Feb. 20, 1992.]

Adoption of KELSEY S., a Minor.
STEVEN A. et al., Plaintiffs and Respondents, v.
RICKIE M., Defendant and Appellant.

RICKIE M., Plaintiff and Appellant, v.
KARI S., Defendant and Respondent.

 

## Counsel

Alys Briggs, under appointment by the Supreme Court, for Defendant and Appellant and for Plaintiff and Appellant.

Van Deusen, Youmans & Walmsley and Christian R. Van Deusen for Plaintiffs and Respondents and for Defendant and Respondent.

## Opinion

**BAXTER, J.**—The primary question in this case is whether the father of a child born out of wedlock may properly be denied the right to withhold his consent to his child's adoption by third parties despite his diligent and legal attempts to obtain custody of his child and to rear it himself, and absent any showing of the father's unfitness as a parent. We conclude that, under these circumstances, the federal constitutional guarantees of equal protection and due process require that the father be allowed to withhold his consent to his child's adoption and therefore that his parental rights cannot be terminated absent a showing of his unfitness within the meaning of Civil Code section 221.20.

### Facts

Kari S. gave birth to Kelsey, a boy, on May 18, 1988. The child's undisputed natural father is petitioner Rickie M.[1] He and Kari S. were not married to one another. At that time, he was married to another woman but was separated from her and apparently was in divorce proceedings. He was aware that Kari planned to place their child for adoption, and he objected to her decision because he wanted to rear the child.

---

[1] We identify the parties by only their given names and last initials to protect the identity of the minor child. As necessary for convenience and clarity, we will occasionally refer to Kelsey as "the child," to Kari S. as "the mother," to Rickie M. as "the father" or "petitioner," and to Steven and Suzanne A. as the "prospective adoptive parents," the "adoptive parents," or "Mr. and Mrs. A."

Two days after the child's birth, petitioner filed an action in superior court under Civil Code section 7006 to establish his parental relationship with the child and to obtain custody of the child. (The petition erroneously stated that the child had not yet been born. His birth was earlier than expected, and petitioner had not been informed of it when he filed his action.) That same day, the court issued a restraining order that temporarily awarded care, custody, and control of the child to petitioner. The order also stayed all adoption proceedings and prohibited any contact between the child and the prospective adoptive parents.

Later that day, petitioner filed a copy of the order with law enforcement officials. He also personally attempted to serve it on the prospective adoptive parents at their home. He was unsuccessful.

On May 24, 1988, Steven and Suzanne A., the prospective adoptive parents, filed an adoption petition under Civil Code section 226.[2] Their petition alleged that only the mother's consent to the adoption was required because there was no presumed father under section 7004, subdivision (a).

On May 26, 1988, the superior court modified its May 20 order and awarded temporary custody of the child to its mother. The court ordered the mother to live with the child in a shelter for unwed mothers. The court also found that its May 20 temporary order had not been followed. The record before us is not entirely clear on this point. Petitioner alleges that the prospective adoptive parents attempted to evade service of the order and secretly removed the child from their home. In this court, the prospective adoptive parents do not directly dispute these allegations. At the May 26 hearing, however, the superior court declined to find a "knowing violation" of its prior order. In any event, the trial court prohibited visitation by either the prospective adoptive parents or petitioner.

On May 31, 1988, the prospective adoptive parents filed a petition under section 7017 to terminate petitioner's parental rights. The superior court consolidated that proceeding with the adoption proceeding. The court allowed petitioner to have supervised visitation with the child at the women's shelter where the child was living with his mother. The court also allowed

---

[2]All section references are to the Civil Code unless otherwise noted.

the prospective adoptive parents to have unsupervised visitation at the shelter.

The parties subsequently stipulated that petitioner was the child's natural father. The superior court, however, ruled that he was not a "presumed father" within the meaning of section 7004, subdivision (a)(4). The court held four days of hearings under section 7017, subdivision (d)(2) to determine whether it was in the child's best interest for petitioner to retain his parental rights and whether the adoption should be allowed to proceed. (The attorney appointed by the trial court to represent the child's interests advocated that petitioner should retain his parental rights.) On August 26, 1988, the court found "by a *bare* preponderance" of the evidence that the child's best interest required termination of petitioner's parental rights. (Italics added.)

Petitioner appealed. He contended the superior court erred by: (1) concluding that he was not the child's presumed father; (2) not granting him a parental placement preference; and (3) applying a preponderance-of-the-evidence standard of proof. The Court of Appeal rejected each of his contentions and affirmed the judgment.

DISCUSSION

1. *The statutory framework*

■ Section 7004 states, "A man is presumed to be the natural father of a child . . ." if the man meets any of several conditions set forth in the statute.[3] Whether a biological father is a "presumed father" under section 7004 is critical to his parental rights. If the mother of a child who does *not* have a presumed father consents to the child's adoption, a petition must,

---

[3]As we have previously noted, the statutory term "presumed father" is somewhat "cumbersome." (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 790, fn. 1 [218 Cal.Rptr. 39, 705 P.2d 362].) A man's parentage of a child may be undisputed and legally proven, but he may nevertheless fail to be a "presumed father" under section 7004. Conversely, even if paternity is denied and legally disproved, a man may be deemed, under some circumstances, to be a "presumed father." We must, however, take the statutory nomenclature as we find it. We therefore shall use the term "presumed father" to mean a man who qualifies under section 7004 and "natural father" to mean a biological father who does not so qualify. (39 Cal.3d at p. 790, fn. 1.)

except in certain narrow circumstances, be filed in the superior court to terminate the natural father's parental rights. (§ 7017, subd. (b).) If the natural father or a man representing himself to be the natural father claims parental rights, the court first must determine whether he is the natural father. (§ 7017, subd. (d)(2).) If so, "The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. . . . If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption." (*Ibid.*) The child's best interest is the sole criterion where there is no presumed father. As in the present case, the trial court's determination is frequently that the child's interests are better served by a third party adoption than by granting custody to the unwed natural father.[4]

Mothers and *presumed* fathers have far greater rights. Under section 221.20, either a mother or presumed father can withhold consent to the adoption except in certain specified and narrow circumstances: (1) if a noncustodial parent willfully fails for a year or more to communicate with and support the child; (2) a court has declared the child to be free of the parent's custody and control pursuant to chapter 4 of title 2 of part 3 of division 1 of the Civil Code, or the parent has voluntarily relinquished his or her rights in a judicial proceeding; (3) the parent has deserted the child without provision for its identification; or (4) the parent has relinquished the child for adoption.[5] Moreover, section 7017, subdivision (d)(2) states that its provision for allowing termination of a natural father's parental rights based

---

[4]Section 7017, subdivision (d)(2) states in its entirety, "If the natural father or a man representing himself to be the natural father claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child. If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, it shall order that that person's consent is not required for an adoption; such a finding terminates all parental rights and responsibilities with respect to the child. Section 4600 does not apply to this proceeding. Nothing in this section changes the rights of a presumed father."

[5]From the time the present action was filed until well after we granted review, the relevant standards for dispensing with parental consent were set forth in former section 224. Effective July 1, 1991, that section was repealed, and the provisions are now set forth without material change in section 221.20. (Stats. 1990, ch. 1363, § 3, No. 6 Deering's Adv. Legis. Service, pp. 5542-5543.) Although this action arose under now-repealed section 224, we will refer to the new statute for convenience because the change does not substantively affect this case.

on the child's best interest does *not* apply to presumed fathers. In short, a mother or a presumed father must consent to an adoption absent a showing by clear and convincing evidence of that parent's unfitness.

This statutory scheme creates three classifications of parents: mothers, biological fathers who are presumed fathers, and biological fathers who are *not* presumed fathers (i.e., natural fathers). A natural father's consent to an adoption of his child by third parties is not required unless the father makes the required showing that retention of his parental rights is in the child's best interest. Consent, however, is required of a mother and a presumed father regardless of the child's best interest. The natural father is therefore treated differently from both mothers and presumed fathers. With this statutory framework in mind, we now examine petitioner's contentions.

### 2. *Acquiring presumed father status by obtaining constructive receipt of the child*

A man becomes a "presumed father" under section 7004, subdivision (a)(4) (hereafter section 7004(a)(4)) if "*[h]e receives the child into his home and openly holds out the child as his natural child.*" (Italics added.) It is undisputed in this case that petitioner openly held out the child as being his own. Petitioner, however, did not physically receive the child into his home. He was prevented from doing so by the mother, by court order, and allegedly also by the prospective adoptive parents.

Respondents contend the statutory scheme allows a mother to preclude her child's father from acquiring presumed father status and thereby eliminate the need for his consent regardless of whether he is a demonstrably fit parent. Petitioner responds that such result is impermissible under the federal constitutional guarantees of equal protection and due process. He claims he should be deemed to be the presumed father under section 7004(a)(4) because he did all that he could do under the circumstances to receive the child into his home. He contends we should not construe the statute in such a way that the mother can unilaterally bar the father from receiving their child into his home and thereby deprive him of presumed father status and the concomitant right under section 221.20 to withhold consent to the child's adoption by third parties. ▮ Petitioner asserts that constructive receipt

is sufficient under section 7004(a)(4) to provide him with presumed father status and the right to withhold consent.

Petitioner's argument in favor of constructive receipt is based largely on the federal Constitution rather than on section 7004(a)(4). He does not contend that either the language or legislative history of the statute supports his view. Indeed, he "agrees that the law as literally written does permit a mother to interfere with the father-child relationship and does deny a natural father equal protection with a natural mother." Rather, he argues that his constitutional right (and that of other natural fathers) to equal protection and due process will be violated unless we construe the statute to provide for constructive receipt. Alternatively, he argues that we should hold the statutory scheme to be invalid under these circumstances.

Petitioner is correct that when possible we should read a statute in a manner that avoids a potential for conflict with the federal Constitution. (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) As Justice Frankfurter observed, "Invalidating legislation is serious business. . . ." (*Morey* v. *Doud* (1957) 354 U.S. 457, 474 [1 LEd.2d 1485,1497, 77 S.Ct. 1344] (dis. opn. of Frankfurter, J.).) We cannot, however, construe a statute contrary to legislative intent merely to eliminate a potential constitutional conflict. The threshold question therefore is whether the statutes support the notion of constructive receipt advocated by petitioner. We conclude the statutes provide no such support.

"We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent." (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) We must begin with the words of the statute. (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) Section 7004(a)(4) states that a man is a presumed father if "[h]e *receives the child into his home* and openly holds out the child as his natural child." (Italics added.) On its face, the statute refers to *actual* receipt of the child. The statute does not refer either explicitly or implicitly to attempted receipt or constructive receipt. As explained above, petitioner acknowledges this much and makes no argument based on the language of section 7004(a)(4). The statutory language, of course, is the best indicator of legislative intent. (*Ex Parte Goodrich* (1911) 160 Cal. 410, 416-417 [117 P. 451].) If the Legislature has provided an express definition, we must take it as we find it. (*Delaney* v. *Superior Court, supra*, 50 Cal.3d 785, 804.) To

construe section 7004(a)(4) to allow constructive receipt, we would have to insert words into the statute so that it would read "receives or attempts to receive." Doing so would violate the cardinal rule that courts may not add provisions to a statute. (*People* v. *Campbell* (1902) 138 Cal. 11, 15 [70 P. 918]; *Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258, 260 [148 P.2d 649].)

 Even if the statute were ambiguous, petitioner does not point to any legislative history supporting a theory of constructive receipt. Nor are we aware of any extrinsic evidence that the Legislature did not mean what it said in section 7004(a)(4). To the contrary, the legislative history of this issue suggests the Legislature was well aware of the restrictions it was placing on unwed fathers. In 1986, the Legislature added subdivision (d)(2) to section 7017. The amendment sets forth the factors for the trial court to consider in determining the rights of a natural (i.e., nonpresumed) father when the mother has relinquished the child for adoption. One of the enumerated factors is "the efforts made by the father to obtain custody." If petitioner were correct that a father's efforts to obtain custody bestowed on him presumed father status under the statutes, the provisions regarding natural fathers who try but are unable to obtain custody would serve no purpose. Under petitioner's view, such fathers would be presumed fathers. The express statutory distinction between presumed fathers and fathers who attempt unsuccessfully to gain custody demonstrates that the members of the latter group are not presumed fathers within the Legislature's intent.

Prior judicial decisions also provide slender support for reading into section 7004(a)(4) a provision for constructive receipt. (We will later discuss whether they support the ultimate result sought by petitioner.) In *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122], a divided court rejected a natural father's argument that he should be deemed a presumed father under section 7004(a)(4) because his efforts to establish contact with his child had been rejected by the mother. More recently, a different Court of Appeal questioned whether the constructive receipt doctrine exists after California's adoption of the Uniform Parentage Act (§ 7000 et seq.) and noted, that "[W]e are neither cited to nor have found any cases affirming the doctrine . . . ." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 710 [266 Cal.Rptr. 274].)

Our decisions provide little guidance on the issue. In *In re Richard M.* (1975) 14 Cal.3d 783 [122 Cal.Rptr. 531 [537 P.2d 363] (*Richard M.*), we decided under former section 230, the statutory predecessor to section 7004(a)(4), that a father had legitimated his child by receiving it into his home for brief periods. We observed, "Nor have the courts been strict in

insisting that the child be actually physically present in the father's home; *a constructive reception may suffice.* [Fn. omitted.] In *Estate of Maxey* [(1967)] 257 Cal.App.2d 391 [64 Cal.Rptr. 837], for example, the father's conduct constituting receipt of his son into his family consisted of seeing the child at the mother's house. The boy apparently visited his father's apartment on only one occasion, at which time he was addressed as 'son' in the presence of other people." (14 Cal.3d at p. 795, italics added.) Despite this seemingly favorable comment on constructive receipt, too much should not be read into the decision.

First, the footnote in the quoted paragraph stated, "It is unnecessary for us here to consider the extent to which courts have expanded the concept of 'receiving.' *Blythe* v. *Ayres* [(1892)] 96 Cal. 532 [31 P. 915], probably goes the farthest in liberally construing this requirement, since the father was found to have satisfied the statutory mandate without ever actually seeing the child. It is noteworthy that this determination was subsequently criticized by this court in *Estate of De Laveaga* (1904) 142 Cal. 158, 169-170 [75 P. 790]." (*Richard M., supra,* 14 Cal.3d at p. 795, fn. 9.) *Richard M.* seems to suggest some physical contact with the child is required.

Second, the father in *Richard M., supra,* 14 Cal.3d 783, had in fact received the child into his home, albeit briefly. The court therefore was not faced with the question before us, i.e., whether constructive receipt is sufficient when the mother prevents actual receipt. ■ " 'It is the general rule that the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 734-735, quoting *River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643].)

■ Third and most important, *Richard M., supra,* 14 Cal.3d 783, was decided in a statutory context much different from the one that now exists. At that time, the determination was whether the child had been legitimated by the father. The *Richard M.* court stressed this fact. "Because of the stigma and unfavorable legal treatment that attends classification of a child as illegitimate, California courts have almost consistently held that [former] section 230 must be liberally construed in favor of finding legitimation." (*Id.,* at p. 793.) If a child were not legitimated, it had no legal father. In 1975, however, the Legislature enacted California's Uniform Parentage Act, which abolished the concept of legitimacy (or illegitimacy) and replaced it with the concept of parentage. (§ 7002; *In re Sabrina H., supra,* 217 Cal.App.3d 702, 709, fn. 7.) Subsequent decisions have observed that the policy reason for straining to find legitimation by expanding the doctrine of constructive

receipt is no longer present. In situations like the one before us, "the baby *will* end up with a father . . ."—either the biological father if he is granted presumed father status or the adoptive father. (*Adoption of Marie R., supra,* 79 Cal.App.3d 624, 629, italics added.)

More recently, we referred to the notion of constructive receipt with apparent disfavor in *Michael U.* v. *Jamie B., supra,* 39 Cal.3d 787 (*Michael U.*). As in the present case, a biological father sought custody of his child despite the mother's objection and her desire to have it adopted by third parties. We reversed an order granting the father temporary custody. In explaining the statutory framework, the lead opinion stated, "Michael is a natural father, not a presumed father, because he has not yet received Eric [the child] into his home. [Citation.] If, however, he actually acquired physical custody, he could receive Eric into his home and thereby acquire the status of a presumed father. [Citations.] . . . Thus the present controversy, although nominally about the temporary custody of Eric pending the adoption proceeding, will probably determine the fate of the proposed adoption." (*Id.,* at p. 791, fn. omitted.) The lead opinion also cited without criticism the statement in *Adoption of Marie R., supra,* 79 Cal.App.3d 624, 630, that constructive receipt is insufficient under section 7004(a)(4). (*Michael U., supra,* 39 Cal.3d at p. 791, fn. 3.)

The observation in *Michael U., supra,* 39 Cal.3d 787, does not resolve the question before us because the issue of constructive receipt was not before the court, and the quoted statements were unnecessary to the decision. *Michael U.* therefore provides no authority for deciding whether the doctrine of constructive receipt is valid under section 7004(a)(4). (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 734-735.) Moreover, the observation as to constructive receipt was made in a lead opinion signed by only two justices. ■ "[A]ny proposition or principle stated in an opinion is not to be taken as the opinion of the court, unless it is agreed to by at least four of the justices." (*Del Mar Water, etc. Co.* v. *Eshleman* (1914) 167 Cal. 666, 682 [140 P. 591]; see generally 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 808, pp. 787-788.)

■ In summary, nothing in the language or legislative history of section 7004(a)(4) supports the claim of constructive receipt. The decisions of the Courts of Appeal have also rejected the claim. We have not previously decided the question and, to the extent we have noted the issue, our decisions either provide little guidance or cast doubt on the notion of constructive receipt, especially in light of the statutory abrogation of illegitimacy. Petitioner therefore correctly admits that section 7004(a)(4) does not by itself provide for presumed father status based on a father's constructive

receipt of the child, i.e., his unsuccessful attempts to obtain custody over the mother's objection. We cannot accept petitioner's invitation to construe section 7004(a)(4) to avoid the alleged constitutional conflict. To do so would require us to judicially rewrite the statute.

There remains, however, the question of whether a natural father's federal constitutional rights are violated if his child's mother is allowed to unilaterally preclude him from obtaining the same legal right as a presumed father to withhold his consent to his child's adoption by third parties. We now turn to that difficult constitutional question.[6]

### 3. *Relevant United States Supreme Court decisions*

The precise question before us has not been addressed by the United States Supreme Court. We are guided, however, by a series of high court decisions dealing with the rights of unwed fathers. From those decisions, we must attempt to distill the guiding constitutional principles.

In *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208] (*Stanley*), the court held that under the due process clause of the Fourteenth Amendment to the federal Constitution an unmarried father was entitled to a hearing on his fitness as a parent before his children were taken from him.[7] *Stanley* is factually distinguishable because the father in that case had lived intermittently with his children and their mother for 18 years. As the court put it, he had "sired and raised" the children. (*Id.*, at p. 651 [31 L.Ed.2d at p. 558].) Unlike in the present case, the children were not infants, and the father had maintained a close relationship with them for many years. Despite these differences from our case, *Stanley* does illuminate our task. The court noted that it had "frequently emphasized the importance of the family. The rights to conceive and to raise one's children has been deemed 'essential' . . . . [¶] Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony." (*Ibid.* [31 L.Ed.2d at pp. 658-659].) A father's "interest in retaining custody of his children is cognizable and substantial." (*Id.*, at p. 652 [31 L.Ed.2d at p. 659].) More important, the court seemed to indicate that a father's parental rights could not be terminated

---

[6]The nature and scope of an unwed parent's rights are questions of enormous practical significance. The United States Census Bureau recently issued "Fertility of American Women," reporting that, for the most recent statistical year (July 1989 to June 1990), 913,000 of 3.9 million births—1 in 4—were out of wedlock. (*Larger Number of New Mothers Are Unmarried*, N.Y. Times (Dec. 4, 1991) p. A20, col. 1.)

[7]Four justices further concluded that the state's denial of a pretermination hearing to the unwed father, while granting a hearing to other parents, was also "inescapably contrary to the Equal Protection Clause" of the Fourteenth Amendment. (*Stanley, supra*, 405 U.S. 645, 658 [31 L.Ed.2d 551, 563].)

absent a showing of his unfitness, and that a showing of the child's best interest would be an insufficient basis for termination of the father's rights. "What is the state interest in separating children from fathers without a hearing designed to determine *whether the father is unfit* in a particular disputed case? We observe that the State registers no gain towards its declared goals [of protecting the child's best interest] when it separates children from the custody *of fit parents*. Indeed, if Stanley is *a fit father*, the State spites its own articulated goals when it needlessly separates him from his family." (*Id.*, at pp. 652-653 [31 L.Ed.2d at p. 559], italics added.) The court has characterized *Stanley* as holding that the father's constitutional rights were violated "absent a hearing and *a particularized finding that the father was an unfit parent.*" (*Quilloin* v. *Walcott* (1978) 434 U.S. 246, 247-248 [54 L.Ed.2d 511, 515, 98 S.Ct. 549], italics added.)

If petitioner is not a presumed parent under section 7004(a)(4), his parental rights may be terminated under section 7017, subdivision (d)(2) merely by showing that termination would be in the child's best interest. No showing of petitioner's unfitness is required under the statutes. The statutory scheme therefore appears to conflict with the emphasis in *Stanley, supra,* 405 U.S. 645, on the need for a *particularized finding of unfitness*. Petitioner was never found to be unfit.

In its next case dealing with unwed fathers, *Quilloin* v. *Walcott, supra,* 434 U.S. 246 (*Quilloin*), the court was faced with a situation more similar to the present case. A child was born out of wedlock and was in the custody and control of his mother for his entire life. She and the natural father never married or established a home together. She married another man, and several years later he attempted to adopt the child with her consent. The child was then 11 years old. The natural father attempted to block the adoption and to secure visitation rights, but he did not seek custody or object to the child's continuing to live with the mother and her husband. Under the Illinois statutory scheme, the trial court denied the father's petition to legitimate the child and thereby precluded him from gaining veto power over the child's adoption, on the ground that legitimation was not in the child's best interests. The father claimed he was entitled to recognition and retention of his parental rights absent a showing of unfitness. The high court framed the issue as being whether the father's interests were adequately protected under the due process and equal protection clauses of the Fourteenth Amendment. (*Id.*, at p. 254 [54 L.Ed.2d at p. 519].) In this key respect, *Quilloin* is like the present case. Under section 7017, subdivision (d)(2), the determinative question is the child's best interest if the father has not gained "presumed" status under section 7004(a)(4).

A unanimous court in *Quilloin, supra,* 434 U.S. 246, reiterated that "[T]he relationship between parent and child is constitutionally protected." (*Id.*, at

p. 255 [54 L.Ed.2d at p. 519].) The court, however, found no denial of either due process or equal protection. As to due process, the court explained, "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, *without some showing of unfitness* and for the sole reason that to do so was thought to be in the children's best interest.' [Citation.] But this is not a case in which the unwed father at any time had, *or sought*, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant [the father]. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.'" (*Ibid.* [54 L.Ed.2d at p. 520], italics added.)

The court also restricted its holding as to equal protection. The father contended he should have the benefit of the same standards applied to married fathers. In rejecting this claim, the court explained, "[H]e has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child. Appellant does not complain of his exemption from these responsibilities and, indeed, he does not even now seek custody of his child." (*Quilloin, supra,* 434 U.S. at p. 256 [54 L.Ed.2d at p. 520].)

The present case has several of the earmarks the court found lacking in *Quilloin, supra,* 434 U.S. 246, and which the court suggested might render invalid a termination of a father's rights based only on a showing of the child's best interest. Those factors are as follows:

(i) Unlike the father in *Quilloin, supra,* 434 U.S. 246, petitioner asked the mother for custody of their child and, when rebuffed, immediately (as soon as the child was born) went to court seeking legal custody. He continues to seek legal recognition of his parental rights.

(ii) The mother does not seek to retain the child and have it adopted by a husband. As put by the *Quilloin* court, "the proposed adoption would place the child with a new set of parents with whom the child had never before lived." (434 U.S. at p. 255 [54 L.Ed.2d at p. 520].) Of course, we recognize that as a result of the lower courts' decisions the child has now been living with the prospective adoptive parents for more than three years. This fact,

however, is not relevant to the analysis of whether petitioner's rights were violated *ab initio*.

(iii) The parties disagree as to the amount of care and support that petitioner provided to the child and its mother. The record is unclear as to whether and to what extent, if any, this dispute affected the trial court's decision that the adoption was barely in the child's best interest. The record is clear, however, that petitioner is not like the natural father in *Quilloin*, who avoided contact with his child until several years after its birth and came forward only when another man tried to adopt it. More important for this part of our analysis, petitioner, also unlike the father in *Quilloin*, did attempt through legal channels to shoulder full responsibility for his child.

In short, the present case is the type of case the high court emphasized it was not deciding in *Quilloin, supra,* 434 U.S. 246. By implication, however, the *Quilloin* decision strongly suggests that the parental rights of a father in petitioner's position may not properly be terminated absent a showing of his unfitness as a father. On the present facts, a showing of the child's best interest would appear to be insufficient under *Quilloin*. This conclusion is reinforced by the high court's next decision on the subject.

In *Caban* v. *Mohammed* (1978) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760] (*Caban*), the natural father (Caban) and mother had lived together for several years in New York. They were never legally married but held themselves out as husband and wife. Two children were born during the relationship. Caban was listed on each child's birth certificate as the father, and he lived with them as their father until his relationship with the mother ended. He contributed to their support. (It seems clear he would have been deemed to be a "presumed father" under California law.)

The mother took the children, left Caban, and began living with another man (Mohammed), whom she married shortly thereafter. For the next nine months, she took the children each weekend to visit their grandmother, who lived near Caban. He was able to visit the children each weekend. The grandmother then moved to Puerto Rico, and at the mother's request took the children there also. Caban continued to communicate with them through his parents, who also resided in Puerto Rico. He then went to Puerto Rico and returned to New York with the children.

The mother and her husband obtained legal custody of the children, but Caban and his new wife were awarded visiting rights. The mother and her husband petitioned to adopt the children. (Under New York law, a mother could petition to adopt her own illegitimate child.) Caban and his wife

cross-petitioned for adoption. The trial court granted the mother's petition, thereby terminating all of Caban's parental rights and obligations.

Caban argued to the high court: (1) that the distinction under New York law between the rights of unwed fathers and other parents violated the equal protection clause of the Fourteenth Amendment, and (2) that *Quilloin, supra,* 434 U.S. 246, recognized a substantive due process right of a natural father to maintain a parental relationship with his children absent a finding of his unfitness as a parent. (*Caban, supra,* 441 U.S. at p. 385 [60 L.Ed.2d at p. 303].)

Of special significance to our case, the court first explained that under New York law a mother could block an adoption merely by withholding her consent, even if adoption were in the child's best interest. An unwed father, no matter how substantial his relationship with the child, could preserve his parental rights only by showing that adoption by the petitioning couple would not be in the child's best interest. (*Caban, supra,* 441 U.S. at pp. 386-387 [60 L.Ed.2d at pp. 303-304].) Put simply by the court, the New York law "treats unmarried parents differently according to their sex." (*Id.,* at p. 388 [60 L.Ed.2d at p. 304].) In this respect, California law is indistinguishable. As explained above (pp. 824-825, *ante*), a mother must consent to adoption except in extreme cases of maternal neglect, i.e., a showing of her unfitness. (§ 221.20.) A biological father without "presumed father" status may, like Mr. Caban, have his rights terminated on nothing more than a showing of the child's best interest. (§ 7017, subd. (d)(2).)

The court began its equal protection analysis with the rule that "Gender-based [i.e., sex-based] distinctions 'must serve important governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause." (*Caban, supra,* 441 U.S. at p. 388 [60 L.Ed.2d at pp. 304-305], quoting *Craig* v. *Boren* (1976) 429 U.S. 190, 197 [50 L.Ed.2d 397, 407, 97 S.Ct. 451].) The court quickly rejected the mother's argument that the distinction was justified by a "fundamental difference between maternal and paternal relations." (*Caban, supra,* 441 U.S. at p. 388 [60 L.Ed.2d at p. 305].) "[M]aternal and paternal roles are not invariably different in importance." (*Id.,* at p. 389 [60 L.Ed.2d at p. 305].) The *Caban* court acknowledged that "[t]he State's interest in providing for the well-being of illegitimate children is an important one." (*Id.,* at p. 391 [60 L.Ed.2d at p. 306].) The court nevertheless concluded that the distinction between unmarried mothers and unmarried fathers violated the equal protection clause because the distinction "does not bear a substantial relation to the State's interest in providing adoptive homes for its illegitimate children." (*Ibid.* [60 L.Ed.2d at pp.

306-307].) Of special significance for our case, the court explained that not all distinctions would be invalid. "In those cases where the father *never has come forward* to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child." (*Id.*, at p. 392 [60 L.Ed.2d at p. 307], italics added.) Petitioner *has* come forward and thus appears to be entitled to some protection under *Caban.*

The *Caban* court, *supra*, 441 U.S. 380, also rejected the state's policy argument "that the requiring of unmarried fathers' consent for adoption would pose a strong impediment for adoption because often it is impossible to locate unwed fathers when adoption proceedings are brought, whereas mothers are more likely to remain with their children." (*Id.*, at p. 392 [60 L.Ed.2d at p. 307].) The court observed, "[I]n cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity, a State should have no difficulty in identifying the father even of children born out of wedlock." (*Id.*, at p. 393 [60 L.Ed.2d at pp. 307-308], fn. omitted.) Likewise here, when a biological father promptly comes forward, acknowledges paternity (which is undisputed), and seeks legal custody, the problem of locating the father simply does not arise.

The high court again considered the rights of biological fathers only four years later in *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985] (*Lehr*). The father and mother lived together before the child's birth, and he visited the child in the hospital when the child was born. He did not, however, live with either the mother or child after its birth, and he did not provide them with any financial support. Nor did he offer to marry the mother. Eight months after the child's birth, the mother married another man. When the child was two years old, the mother and her new husband began adoption proceedings. One month later, the biological father filed an action seeking a determination of his paternity, an order of support, and visitation with the child. Shortly thereafter, the biological father learned of the pending adoption proceeding, and almost immediately he sought to have it stayed pending the determination of his paternity petition. The state court informed him that it had already signed the adoption order earlier that day, and then dismissed his paternity action.

Relying on *Stanley*, *supra*, 405 U.S. 645, and *Caban*, *supra*, 441 U.S. 380, the biological father contended the New York statutory scheme was unconstitutional on due process and equal protection grounds. First, he argued that a putative father's actual or potential relationship with his child born out of wedlock is a liberty interest that could not be destroyed without due process of law. He therefore contended he had a right to prior notice and an

opportunity to be heard before he was deprived of that interest. Second, he contended the equal protection clause of the Fourteenth Amendment was violated because the statutes denied him the right to consent to the adoption and accorded him fewer procedural rights than were given to the mother.

The *Lehr* court, *supra*, 463 U.S. 248, rejected the biological father's due process challenge, on the ground that under New York law he could have enrolled in that state's "putative father registry." (*Id.*, at pp. 250-251 [77 L.Ed.2d at pp. 619-620].) If he had done so, he would have been statutorily entitled to receive notice of any proceeding to adopt his child. The high court held that the statutory scheme "adequately protected appellant's inchoate interest in establishing a relationship with Jessica [the child]. . . ." (*Id.*, at p. 265 [77 L.Ed.2d at p. 629].) In the present case, petitioner claims no violation of procedural due process based on lack of notice. (He has participated fully in these proceedings since their inception.) Thus, the discussion in *Lehr*, *supra*, 463 U.S. 248, of procedural due process does not resolve the substantive question before us.

The court's rejection in *Lehr*, *supra*, 463 U.S. 248, of the father's equal protection claim is more relevant to our decision. Under New York law, as in California, the mother of a child (born either in or out of wedlock) is guaranteed the right to veto an adoption of her child unless the mother is found to be unfit as set forth in the statutes. Only some fathers, however, are included within this favored class. In upholding this distinction, the court observed, "[T]he existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child." (*Id.*, at pp. 266-267 [77 L.Ed.2d at p. 630].) The court noted the importance of this factor in its prior decisions. In *Quilloin*, *supra*, 434 U.S. 246, the father had never shouldered any significant responsibility for the child and thus was not denied equal protection. In *Caban*, *supra*, 441 U.S. 380, however, the father had fully participated in the rearing of his children and did have a right under the equal protection clause to withhold consent to their adoption. The *Lehr* court, *supra*, 463 U.S. 248, held that, "[b]ecause appellant, like the father in *Quilloin*, has never established a substantial relationship with his daughter . . . the New York statutes at issue in this case did not operate to deny appellant equal protection." (*Id.*, at p. 267 [77 L.Ed.2d at p. 630].)

On its face, *Lehr*, *supra*, 463 U.S. 248, does not resolve the dilemma before us. The stated premise of the court's holding was that the equal protection clause does not prevent a state from according a child's biological father fewer rights than the mother if he has "never established a relationship" with the child. (*Id.*, at pp. 267-268 [77 L.Ed.2d at pp. 630-631].) The

court did not purport to decide the legal question in the present case, that is, whether the mother may constitutionally prevent the father from establishing the relationship that gives rise to his right to equal protection. The *Lehr* court, however, recognized the uniqueness of the biological connection between parent and child. "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." (*Id.*, at p. 262 [77 L.Ed.2d at p. 627].) *Lehr* can fairly be read to mean that a father need only make a reasonable and meaningful attempt to establish a relationship, not that he must be successful against all obstacles.

The most recent relevant high court decision arose in California. (*Michael H. v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], (*Michael H.*).) Michael H. claimed to be the father of a child and sought a declaration of paternity and visitation rights. (*Id.*, at p. 118 [105 L.Ed.2d at p. 103.) Blood tests showed a 98.07 percent probability that Michael H. was the father. (*Id.*, at p. 114 [105 L.Ed.2d at p. 100].) The mother, however, was married to and living with another man at the time of conception. On grounds not relevant to the present case, the high court upheld the denial of Michael H.'s request for a declaration of paternity and visitation rights. (A plurality of the court found to be constitutional the conclusive presumption in California Evidence Code section 621 that the mother's husband was the child's father.) Of special significance for us, however, four justices agreed that the biological father had a protected liberty interest in his relationship with his child. (*Id.*, at p. 136 [105 L.Ed.2d at pp. 114-115] (dis. opn. by Brennan, J., with Marshall and Blackmun, JJ., conc.); *id.*, at p. 157 [105 L.Ed.2d at p. 128] (dis. opn. by White, J., with Brennan, J., conc.).) Justice Stevens in concurrence assumed for purposes of the decision that the natural father's relationship was entitled to constitutional protection. (*Id.*, at p. 133 [105 L.Ed.2d at p. 112].) As another state's high court subsequently observed, even the author of the two-justice lead opinion in *Michael H.* (Scalia, J.) left open the question of whether the result would have been different if the marital parents had not wanted to raise the child as their own. (*Matter of Raquel Marie* (1990) 76 N.Y.2d 387, 401 [559 N.Y.S.2d 855, 559 N.E.2d 418, 423].) Although we must not read too much into *Michael H., supra*, 491 U.S. 110, it is clear that even in the extreme circumstances of that case—the mother being married to and living with her husband, who was not the child's biological father—a majority of the justices were solicitous of the rights of unwed biological fathers. For them, the determinative factor was whether a biological father has attempted to establish a relationship with his child.

Although the foregoing high court decisions do not provide a comprehensive rule for all situations involving unwed fathers, one unifying and transcendent theme emerges. ■ The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship.

This principle was acknowledged in a recent decision by New York's high court, in which the court grappled with the question now before us. In *Matter of Raquel Marie, supra,* 76 N.Y.2d 387 [559 N.E.2d 418] (*Raquel Marie*), the court was faced with a New York statute similar to our section 7004(a)(4) in that the statute created classes of unwed fathers whose consent was required for adoption. The statute distinguished between newborns and older children. The father of a child under six months old had a right to withhold consent to an adoption only if the father met three conditions. He had to live openly with the child or mother for six continuous months immediately preceding the child's placement for adoption, openly acknowledge his paternity during that period, and pay reasonable pregnancy and birth expenses in accordance with his means. The court held the statute to be unconstitutional.

The *Raquel Marie* court, *supra,* 76 N.Y.2d 387 [559 N.E.2d 418], reviewed the relevant United States Supreme Court decisions and observed, correctly in our view, that "[t]he [father's] protected interest is not established simply by biology. The unwed father's protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one." (*Id.,* at p. 401 [559 N.E.2d at p. 423-424], citation omitted.) The court explained the problem: "In the case of a child placed for adoption at birth, the father can have no more than a biological connection to the child, there having been no chance for a custodial relationship. Protection of his parental interest would depend, then, upon recognition of a constitutional right to the opportunity to develop a qualifying relationship with the infant. [¶] That open question is before us today: is the full measure of constitutional protection—the right to a continued parental relationship absent a finding of unfitness—ever required where a child is placed for adoption before any real relationship can exist, and if so, what actions on the unwed father's part would demonstrate his willingness to take parental responsibility sufficient to give rise to such rights?" (*Id.,* at pp. 401-402 [559 N.E.2d at p. 424].)

The *Raquel Marie* court, *supra,* 76 N.Y.2d 387 [559 N.E.2d 418], unanimously answered the question in favor of the father. "[A] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing

termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship." (*Id.*, at p. 403 [559 N.E.2d at p. 425].) The flaw in the statute was its requirement that the father live with the mother or child before the child's birth. This requirement permitted adoption "despite the father's prompt objection even when he wishes to form or actually has attempted to form a relationship with the infant that would satisfy the State as substantial, continuous and meaningful by any other standard." (*Id.*, at p. 405 [559 N.E.2d at p. 426].) In short, it was improper to make the father's rights contingent on the mother's wishes. Likewise, the Georgia Supreme Court has held that a natural father who seeks to establish a relationship with his child must be provided the same rights as the mother. (*In re Baby Girl Eason* (1987) 257 Ga. 292 [358 S.E.2d 459, 463].)[8]

Similar concerns arise under section 7004(a)(4) because the father's ability to receive the child into his home is largely dependent on the mother's discretion. However, before setting forth what we believe to be the correct constitutional rule in light of the high court decisions, we shall briefly revisit prior California decisions.

### 4. *California decisions*

Because we are faced with a federal constitutional question, we must adhere, of course, to the decisions of the United States Supreme Court. It has provided a framework that strongly supports petitioner but has not *squarely* answered the exact question before us. We therefore have looked to relevant California decisions for additional guidance. They provide no clear answer, but our decisions in particular at least reflect an acknowledgement of some degree of federal constitutional protection for natural fathers.

We begin with *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918] (*Baby Girl M.*), in which we held a trial court erred in terminating a natural father's parental rights based on a best-interest-of-the-child standard without first determining whether granting custody to the

---

[8]Other states have also recognized a natural father's constitutionally cognizable interest in his child. "[A] fully committed unwed father of a newborn child has a constitutionally protected interest in his opportunity to develop a mutually beneficial emotional or psychological bond with his child. . . . [¶] It may be more difficult for a recently born child's father to adduce objective proof of his commitment to parental responsibilities, but the due process guarantee is not so narrow as to permit a state to deny him the chance to do so." (*In re Adoption of B.G.S.* (La. 1990) 556 So.2d 545, 550-551.) The Supreme Court of Florida has recognized that, "It is clear from *Lehr* [463 U.S. 248] that the biological relationship offers the parent the opportunity to assume parental responsibilities. Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance." (*Matter of Adoption of Doe* (Fla. 1989) 543 So.2d 741, 748.) The court held that the father had not "grasped his opportunity," but the decision makes clear he had a constitutional right to do so.

natural father would be detrimental to the child. The relevant facts are similar to the present case. In *Baby Girl M.*, the mother and father had a brief relationship that resulted in pregnancy. They separated, however, and the father was unaware of the pregnancy until shortly after the child's birth. Despite the father's desire to raise the child, the mother placed it for adoption, and his parental rights were terminated by the trial court without a finding that it would be detrimental to the child to award custody to the father. We reversed the judgment.

The linchpin of our decision in *Baby Girl M.* was statutory rather than constitutional. Section 7017, subdivision (d), as it was then worded, set forth the procedure for terminating a natural father's rights before granting an adoption petition. Section 7017, however, did not specify what standard should be used in determining whether to terminate the father's rights. Based on the legislative history of section 7017 and a prior decision of this court, we concluded that section 4600 applied to a section 7017 custody hearing. (37 Cal.3d at p. 69.) Section 4600 states that before awarding custody to a nonparent a court must find that "an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." We need not belabor the *Baby Girl M.* court's statutory analysis. Two years after our decision, the Legislature amended section 7017, abrogating our decision by stating, "Section 4600 does not apply to this proceeding." (Stats. 1986, ch. 1370, § 2, p. 4905; § 7017, subd. (d)(2).)

In dictum, the *Baby Girl M.* court, *supra*, 37 Cal.3d 65, briefly discussed the high court decisions dealing with unwed fathers. (*Id.*, at pp. 73-75.) We did not expressly base our decision on constitutional grounds, but we suggested that a parental preference was required as a matter of federal constitutional law.[9] The majority opinion quoted with approval the conclusion of a law review article that " '. . . the state may not deny biological parents *the opportunity* to establish a protected custodial relationship.' " (37 Cal.3d at p. 74 (italics added), quoting Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson* (1984) 45 Ohio St. L.J. 313, 351.) This observation, although perhaps unnecessary, tends to support petitioner's position.

Only one year later, we were again faced with an unwed father's attempt to rear his child in *Michael U., supra*, 39 Cal.3d 787. The father sought temporary custody of the child so that he could qualify as a "presumed

[9]As a Court of Appeal has recently observed, "The precise grounds of the [*Baby Girl M.*] holding are unclear." (*Jermstad v. McNelis* (1989) 210 Cal.App.3d 528, 548 [258 Cal.Rptr. 519].)

father" under section 7004(a)(4) and thereby gain the right under section 7017, subdivision (d) to withhold his consent to the child's adoption. The trial court granted him custody. We reversed because the trial court's implied finding that the award of custody would not be detrimental to the child was not supported by substantial evidence. The court was sharply divided, however, with four separate opinions, none of which garnered the votes of more than two justices. Because there was no majority opinion, none of the four opinions has any precedential value. (*Del Mar Water, etc. Co.* v. *Eshleman, supra,* 167 Cal. 666, 682.) Moreover, the basis for the decision was our prior holding in *Baby Girl M., supra,* 37 Cal.3d 65, that section 4600 applied to a section 7017 termination proceeding and thus precluded an award of custody to nonparents without both parents' consent or a finding that an award of custody to a parent would be detrimental to the child. (*Michael U., supra,* 39 Cal.3d 787, 791.) As explained above (p. 840, *ante*), the Legislature in 1986 abrogated our decision by amending section 7017, subdivision (d) to make clear that section 4600 does not apply in termination proceedings. *Michael U.* sheds little, if any, light on the constitutional issue before us.

The question of unwed fathers' rights has also been addressed by the Courts of Appeal. In *Adoption of Marie R., supra,* 79 Cal.App.3d 624 (*Marie R.*), a divided court held that, with respect to a nonmarital child, a mother may, by her conduct, prevent a natural father from acquiring the status of "presumed father." (*Id.,* at p. 630.) This conclusion seems to have been based on the premise that constructive receipt of the child was not sufficient to become a presumed father under section 7004. As a matter of statutory construction, we agree. (See discussion at pp. 825-827, *ante.*) The *Marie R.* majority opinion, however, also noted in passing that the Legislature may constitutionally distinguish between types of fathers. (79 Cal.App.3d at p. 311.) To that extent, the court seemed to hold, as a constitutional matter, that a natural father could be denied the right to withhold consent to his child's adoption even if the father promptly did all he could do to fulfill his parental responsibilities.

Similarly, in *W. E. J.* v. *Superior Court* (1979) 100 Cal.App.3d 303 [160 Cal.Rptr. 862] (*W. E. J.*), the same divided court held that a a natural father was not entitled to his child's custody for the purpose of becoming a presumed father and thereby gaining a right to withhold consent to the child's adoption. In rejecting the father's claim to custody, the majority broadly stated that the statutory distinction between natural and presumed fathers is constitutionally valid. (*Id.,* at pp. 313-315.) This holding was not restricted to those natural fathers who have failed to demonstrate a sufficient commitment to their responsibilities.

The question of unwed fathers' rights more recently arose in *Jermstad* v. *McNelis*, *supra*, 210 Cal.App.3d 528 (*Jermstad*). The natural father was an officer in the merchant marine. He learned while at sea that the woman he had been dating was pregnant with their child. When he returned, they discussed what to do. She wanted to place the child for adoption. He did not want to do so but felt that he would be unable to obtain legal custody in light of the nature of his work, which periodically kept him at sea. After further discussions with the mother and with the prospective adoptive parents whom she had selected, the father decided not to seek custody. The father, however, visited the baby the day it was born and for the first time announced that he intended to seek custody. The trial court subsequently entered judgment determining him to be the father and awarding custody to him.

The Court of Appeal affirmed, rejecting the mother's argument that a mother has an absolute right to prevent her child's biological father from acquiring the status of a presumed father. The court explained that under section 7010, subdivision (c) the judgment in an action to determine parentage may provide for an award of custody.[10] Thus, the *Jermstad* court concluded that, in an action under section 7006 to establish the father and child relationship, the trial court may award custody to the natural father so that he can receive the child into his home and become a presumed father.

█ We agree that the courts have the authority under this state's Uniform Parentage Act to grant custody to the natural father despite the mother's objection. In the present case, the superior court had the authority to grant petitioner custody of his child so that he could qualify as a presumed father under section 7004, subdivision (a). Indeed, the superior court initially did so but shortly thereafter reversed itself after enforcement of its order was thwarted.

For the question now before us, the more significant portion of *Jermstad*, *supra*, 210 Cal.App.3d 528, is the court's analysis of the natural father's constitutional claim. The court rejected the mother's argument that the father was improperly given a parental preference over the couple who sought to adopt the child. The issue of parental preference also arises in this case. Petitioner contends that, if we find him not to be a presumed father under section 7004(a)(4), we should protect his claimed constitutional rights by granting him a parental preference under section 4600, subdivision (c),

---

[10]Section 7010, subdivision (c) states, "The judgment or order may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the judgment, or any other matter in the best interest of the child. The judgment or order may direct the father to pay the reasonable expenses of the mother's pregnancy and confinement."

which states: "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."

*Jermstad, supra,* 210 Cal.App.3d 528, concluded, "[t]he natural father must be afforded a parental preference under the amended statute [section 7017] where he promptly acknowledges paternity and seeks custody of the child." (*Id.,* at p. 545.) In reaching this conclusion, the Court of Appeal reviewed the relevant United States Supreme Court decisions and those of this court and then considered the 1986 amendment to section 7017, which was enacted after those decisions. The mother claimed the effect of the amendment, which made section 4600 inapplicable to proceedings under section 7017, was to prohibit a parental preference in those proceedings. The *Jermstad* court disagreed on two grounds. ■ The court first explained that, to the extent the majority opinion in *Baby Girl M., supra,* 37 Cal.3d 65, rested on federal constitutional considerations, it was not subject to being overruled by legislative enactment. (*Jermstad, supra,* 210 Cal.App.3d at p. 549.) We agree.

Second and more important for our analysis, the *Jermstad* court, *supra,* 210 Cal.App.3d 528, stated that the correct reading of the decisions by the United States Supreme Court is that a state may not deny a biological parent the opportunity to establish a protected custodial relationship with his or her child. The *Jermstad* court concluded that in light of this constitutional protection the amendment to section 7017 did not (and properly could not) deprive a natural father of the parental preference under section 4600. The court reasoned as follows: "If we read the amendment as barring a parental preference in cases where the natural father has promptly come forward to grasp his opportunity interest and diligently pursued that interest we effectively deny these 'biological parents the opportunity to establish a protected custodial relationship.' The opportunity for protection of a custodial relationship is illusory if it is subject to being nipped in the bud by application of the unprotected best interest of the child comparison with prospective adoptive parents. [¶] However, we do not discern in the 1986 amendment [to section 7017] an intention to infringe the opportunity interest of the natural father in this manner. Indeed, it appears to have been crafted with the contrary end in view. That is so notwithstanding the new proviso declaring that section 4600 does not apply, for this is not the only alteration wrought by the 1986 amendments to section 7017. The amended text specifies the *criteria* material to the determination whether 'it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to

proceed.' Of significance, it directs that '[t]he court, in making that determination, may consider all relevant evidence, including efforts made by the father to obtain custody . . . .' This consideration conditions the best interest test and meshes with the federal constitutional concerns. [¶] . . . In a case where the natural father has diligently sought to shoulder the burdens of the parental relationship, including the burden of custody, the requirement of parental preference arises from the federal Constitution." (*Jermstad, supra*, 210 Cal.App.3d at pp. 550-551, italics in original.) We agree with the *Jermstad* court that a biological father has a constitutionally cognizable opportunity interest in developing a relationship with his child. However, in light of the Legislature's prompt and unequivocal amendment to section 4600 to supersede our decision in *Baby Girl M., supra*, 37 Cal.3d 65, we cannot conclude that the Legislature intended to preserve the detriment standard. To the contrary, it is clear that the Legislature meant to provide natural fathers with far less rights than both mothers and presumed fathers have under California's statutory system. The question is whether that distinction is constitutionally tenable.

### 5. *The constitutionally protected interest of an unwed, natural father*

Petitioner asserts a violation of equal protection and due process under the federal Constitution; more specifically, that he should not be treated differently from his child's mother. In constitutional terms, the question is whether California's sex-based statutory distinction between biological mothers and fathers serves " '. . . important governmental objectives and [is] *substantially related* to achievement of those objectives.' " (*Caban, supra*, 441 U.S. 380, 388 [60 L.Ed.2d 297, 304-305], italics added.) Does the mother's ability to determine the father's rights substantially serve an important governmental interest? The question is the same "whether the analysis [is] undertaken as a matter of due process or equal protection." (*Raquel Marie, supra*, 76 N.Y.2d at p. 403 [559 N.E.2d at p. 425].)

There is no dispute that "The State's interest in providing for the well-being of illegitimate children is an important one." (*Caban, supra*, 441 U.S. at p. 391 [60 L.Ed.2d at p. 306]; *Raquel Marie, supra*, 76 N.Y.2d at p. 403 [559 N.E.2d at p. 425].) Although the legal concept of illegitimacy no longer exists in California, the problems and needs of children born out of wedlock are an undisputed reality. The state has an important and valid interest in their well-being.

The more difficult issue is whether the statutory treatment of natural fathers (i.e., biological fathers without presumed status under section 7004) is *substantially* related to the achievement of that objective. On the facts of

this case, the question must be framed as follows: Is the state's important interest in the well being of a child born out of wedlock substantially furthered by allowing the mother to deny the child's biological father an opportunity to form a relationship with the child that would give the father the same statutory rights as the mother (or a presumed father) in deciding whether the child will be adopted by third parties?[11]

Respondents do not adequately explain how an unwed mother's control over a biological father's rights furthers the state's interest in the well-being of the child. The linchpin of their position, however, is clear although largely implicit: Allowing the biological father to have the same rights as the mother would make adoptions more difficult because the consent of both parents is more difficult to obtain than the consent of the mother alone. This reasoning is flawed in several respects.

A. Respondents' view too narrowly assumes that the proper governmental objective is adoption. As we have explained, the constitutionally valid objective is the protection of the child's well-being. We cannot conclude in the abstract that *adoption* is itself a sufficient objective to allow the state to take whatever measures it deems appropriate. Nor can we merely assume, either as a policy or factual matter, that adoption is necessarily in a child's best interest. This assumption is especially untenable in light of the rapidly changing concept of family. As recently as only a few years ago, it *might* have been reasonable to assume that an adopted child would be placed into a two-parent home and thereby have a more stable environment than a child raised by a single father. The validity of that assumption is now highly suspect in light of modern adoption practice. Recent statistics show that a significant percentage of children placed for independent adoption—7.7 percent—are adopted by a single parent. (Cal. Dept. of Social Services, Characteristics of Independent Adoptions in Cal., July 1989—June 1990, table 34.) The figure is even higher—21.9 percent—for children placed with agencies for adoption. (Cal. Dept. of Social Services, Characteristics of Relinquishment Adoptions in Cal., July 1989—June 1990, table 29.) We note that New York's high court also recently rejected the argument that the state has a sufficiently strong interest in providing two-parent families to discriminate against unwed fathers. (*Raquel Marie, supra,* 76 N.Y.2d at p. 406 [559 N.E.2d at p. 427].)

---

[11]By referring to a mother's decision to prevent her child's natural father from becoming a presumed father, we do not suggest, and there should be no inference, that any moral culpability should be attributed to the mother in those circumstances. Such is not our purview. Moreover, we think it a matter of common knowledge that an unwed mother's decision as to her child's future is emotionally wrenching and a matter of grave deliberation on her part. We can reasonably expect that in most such cases the mother is acting out of deep concern for her child's best interest. That honorable intention, however, does not provide a *legal* basis on which to determine the biological father's rights.

If the possible benefit of adoption were by itself sufficient to justify terminating a parent's rights, the state could terminate an unwed *mother's* parental rights based on nothing more than a showing that her child's best interest would be served by adoption. Of course, that is not the law; nor do the parties advocate such a system. We simply do not in our society take children away from their mothers—married or otherwise—because a "better" adoptive parent can be found. We see no valid reason why we should be less solicitous of a father's efforts to establish a parental relationship with his child. Respondents seem to suggest that a child is inherently better served by adoptive parents than by a single, biological father but that the child is also inherently better served by a single, biological mother than by adoptive parents. The logic of this view is not apparent, and there is no evidence in the record to support such a counterintuitive view.

B. Nor is there evidence before us that the statutory provisions allowing the mother to determine the father's rights are, in general, *substantially* related to protecting the child's best interest. As a matter of cold efficiency, we cannot disagree that eliminating a natural father's rights would make adoption easier in some cases. (*Raquel Marie, supra,* 76 N.Y.2d at p. 401 [559 N.E.2d at p. 425].) That, however, begs the question because it assumes an unwed mother's decision to permit an immediate adoption of her newborn is always preferable to custody by the natural father, even when he is a demonstrably fit parent. We have no evidence to support that assumption. Moreover, the assumption has already been rejected by the United States Supreme Court: "It may be that, given the opportunity, some unwed fathers would prevent the adoption of their illegitimate children. This impediment to adoption usually is the result of a natural parental interest shared by both genders [sexes] alike; it is not a manifestation of any profound difference between the affection and concern of mothers and fathers for their children. Neither the State nor the appellees have argued that unwed fathers are more likely to object to the adoption of their children than are unwed mothers; nor is there any self-evident reason why as a class they would be." (*Caban, supra,* 441 U.S. 380, 391-392 [60 L.Ed.2d 297, 306-307].) New York's high court has also rejected the contention that a father's rights can be trampled in the name of efficiency. (*Raquel Marie, supra,* 76 N.Y.2d at p. 401 [559 N.E.2d at p. 426].)[12]

C. The lack of any substantial relationship between the state's interest in protecting a child and allowing the mother sole control over its destiny is

---

[12]The efficiency to be gained under respondents' view would be minimal. Section 7017, subdivision (f) requires that notice of the adoption proceedings ". . . shall be given to every person identified as the natural father or a possible natural father . . . ." If he claims parental rights, the court must conduct a hearing to determine if he is the father and ". . . if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. . . . If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, it shall order that his consent is

best demonstrated by the results that can arise when a mother prevents the father from obtaining presumed status under section 7004, subdivision (a). (As noted above, we attribute no blame to a mother who seeks to place her child for adoption.) (P. 845, fn. 11, *ante*.) Under the statute, the father has basically two ways in which to achieve that status: he can either marry the mother, or he can receive the child into his home and hold it out as his natural child. Of course, the first alternative is entirely within the mother's control. She cannot be forced to marry the father. The second alternative is, for the most part, also within her control. She can deny the father the right to come into her home. She can also deny him the right to take the child into his home. Faced with the mother's denial, the father has only one recourse aside from illegal self-help. He must seek a court order granting him custody so that he can take the child into his home and thereby gain presumed father status. As in this case, however, the trial court may deny him custody based on its view that the child is better served by remaining with the mother or third parties, e.g., prospective adoptive parents. Similarly, he may (as apparently initially occurred in this case) obtain a court order granting him custody, but enforcement of the order may be thwarted by third parties.

The anomalies under this statutory scheme become readily apparent. A father who is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities can have his rights terminated merely on a showing that his child's best interest would be served by adoption. If the child's mother, however, were equally of the opposite character—*un*ready, *un*willing, and *un*able—her rights in the child could nevertheless be terminated only under the much more protective standards of section 221.20. Such a distinction bears no substantial relationship to protecting the well-being of children. Indeed, it has little rationality.

The system also leads to irrational distinctions between fathers. Based solely on the mother's wishes, a model father can be denied presumed father status, whereas a father of dubious ability and intent can achieve such status by the fortuitous circumstance of the mother allowing him to come into her

necessary for an adoption." (§ 7017, subd. (d)(2).) Because section 7017 already provides for notice and a hearing for natural (i.e., nonpresumed) fathers, our decision will create no new procedures in those cases in which a natural father seeks to retain his parental rights. Rather, our decision merely prescribes a different standard for the trial court to employ in determining whether the natural father's consent is required for an adoption.

Nor is there any evidence before us which suggests that a significant number of biological fathers (whether presumed or natural under the statutes) now bring or will bring legal actions seeking to assume their parental responsibilities.

The perceived efficiency would also be absent in those cases in which the biological father's rights would have to be determined under the law of a state with standards more protective than those of California. Many adoptions involve a biological father in one state and adoptive parents in another.

home, even if only briefly—perhaps a single day. We cannot ignore reality. Parental unfitness is considerably more difficult to show than that the child's best interest is served by adoption. Under the statutory scheme, two fathers who are by all accounts equal in their ability and commitment to fulfill their parental missions can be treated differently based solely on the mothers' decisions whether to allow the father to become a presumed father.

The system also makes little sense from a child's perspective. A child may have a wholly acceptable father who wants to nurture it, but whose parental rights can be terminated under the best-interest standard because the mother has precluded the father from attaining presumed father status. Conversely, if a presumed father is highly questionable in every respect, he is nevertheless allowed to withhold consent absent proof by clear and convincing evidence that he is unfit. (§§ 221.20 and 232.) As a practical matter, the child's best interest is largely ignored by the statutory distinction between presumed fathers and those natural fathers who are willing to assume their parental responsibilities.

D. We must not lose sight of the way in which the present case and others like it come before the courts. A mother's decision to place her newborn child for adoption may be excruciating and altogether altruistic. Doing so may reflect the extreme of selflessness and maternal love. *As a legal matter*, however, the mother seeks to sever all ties with her child. The natural father, by contrast, has come forward to assume the legal and practical burdens of being a parent. This is not a case where the mother and father are pitted against one another for the child's custody. Even if it could be said, either in general or in a particular case, that the mother somehow has a greater connection than the father with their child and thus should have greater rights in the child, the same result need not obtain when she seeks to relinquish custody and to sever her legal ties with the child and the father seeks to assume his legal burdens.

Clearly, the father is treated unfairly under section 7004, subdivision (a), but equally important is the loss to the child. The child has a genetic bond with its natural parents that is unique among all relationships the child will have throughout its life. "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility." (*Lehr, supra*, 463 U.S. 248, 256 [77 L.Ed.2d 614, 623].) It therefore would be curious to conclude that the child's best interest is served by allowing the one parent (the mother) who wants to sever her legal ties to decide unilaterally that the only other such tie (the father's) will be cut as well. Absent a showing of a father's unfitness, his child is ill-served by allowing its mother effectively to preclude the child from ever having a meaningful relationship with its only other biological parent.

E. In summary, we hold that section 7004, subdivision (a) and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.[13]

A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate "a willingness himself to assume full custody of the child—not merely to block adoption by others." ▮▮▮ (*Raquel Marie, supra*, 76 N.Y.2d at p. 408 [559 N.E.2d at p. 428].) A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child.[14]

We reiterate and emphasize the narrowness of our decision. The statutory distinction between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities. Our statutes (§§ 7004 & 7017, subd. (d)(2)) are constitutionally sufficient

---

[13]To the extent they are contrary to our decision, we disapprove *W. E. J., supra*, 100 Cal.App.3d 303, and *Marie R., supra*, 79 Cal.App.3d 624. We have previously disapproved of *W. E. J., supra*, 100 Cal.App.3d 303, on other grounds as well. (*Baby Girl M., supra*, 37 Cal.3d 65, 72 (disapproving conclusion that detriment standard in § 7017 proceeding automatically gives a natural father the same veto power as a presumed father).)

[14]At the risk of stating the obvious, we caution that our decision affords no protection, constitutional or otherwise, to a male who impregnates a female as a result of nonconsensual sexual intercourse. We find nothing in the relevant high court decisions that provides such a father a right to due process in connection with the custody and adoption of his biological child. Such a father also is not entitled to equal protection, i.e., the same rights as the mother, because the father and mother are clearly not similarly situated. The sexual intercourse was voluntary only for the father. Nor is such a father entitled to be treated similarly to those males who become fathers as a result of consensual sexual intercourse.

when applied to a father who has failed to make such a showing. Moreover, section 7018 explicitly provides that if any portion of the state's Uniform Parentage Act ". . . or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications . . . ."

### 6. *Application of the correct standard to this case*

The trial court found that adoption was in the child's best interest. The court, however, did not have the benefit of our decision in this case and thus did not decide the threshold constitutional question of whether petitioner demonstrated a sufficient commitment to his parental responsibilities. Petitioner and the prospective adoptive parents sharply disagree on that question, and the evidence is conflicting in several respects as to petitioner's attempts to fulfill his responsibilities, especially during the period *before* the child's birth. We therefore conclude the more prudent approach is to remand to the trial court to make the determination in the first instance. In doing so, the trial court must take into account petitioner's conduct throughout the period since he learned he was the biological father, including his conduct during the pendency of this legal proceeding, both in the trial and appellate courts, up to the determination in the trial court on remand by this court. We recognize that during these proceedings petitioner may have been restricted, both legally and as a practical matter, in his ability to act fully as a father. Nevertheless, the trial court must consider whether petitioner has done all that he could reasonably do *under the circumstances*.

If the trial court finds on remand that petitioner failed to demonstrate the required commitment to his parental responsibilities, that will be the end of the matter. He will not have suffered any deprivation of a constitutional right. If, however, the required commitment is found, the result under our constitutional analysis will necessarily be a decision that petitioner's rights to equal protection and due process under the federal Constitution were violated to the extent that he was deprived of the same statutory protections granted the mother. Therefore, if (*but only if*) the trial court finds petitioner demonstrated the necessary commitment to his parental responsibilities, there will arise the further question of whether he can be deprived of the right to withhold his consent to the adoption.

Section 7017, subdivision (a) states that parental consent is required except in certain narrow circumstances set forth in section 221.20, that is, absent a showing of abandonment or a parent's unfitness under section 232. Because the trial court did not treat petitioner as a presumed father, the court did not reach the question of whether he was statutorily unfit under section

232 and thus could be deprived of his right under section 221.20 to withhold consent. As with the threshold question of whether petitioner did all he could reasonably do to act like a father, we cannot fairly decide in the first instance whether he was unfit and could thus be deprived of his right to withhold consent. We leave it to the trial court to decide this question, if necessary.

In deciding this question, the trial court shall take into account (as it must also do on the threshold question of whether petitioner assumed his parental responsibilities) petitioner's conduct and circumstances up to and including the time of the decision on remand. The proper standard is whether he is *now* fit or unfit. For purposes of remand, we also note subdivision (c) of section 232, which states: "A finding pursuant to this section shall be supported by *clear and convincing evidence*." (Italics added.) Thus, any finding of petitioner's unfitness must be supported by clear and convincing evidence. Absent such evidence, he shall be permitted to withhold his consent to the adoption.

We emphasize that the sole question before us is whether petitioner has a right to withhold his consent to the adoption of his biological child. We decide no issue as to the custody of the child. If petitioner fails to establish on remand that he has a right to withhold his consent, there will be no question as to whether he should have custody of the child. If, however, the trial court concludes that petitioner has a right to withhold consent, that decision will bear only on the question of whether the adoption will proceed. Even if petitioner has a right to withhold his consent (and chooses to prevent the adoption), there will remain the question of the child's custody. That question is not before us, and we express no view on it.

### 7. *Application of our decision to other cases*

In recognition of the importance of prompt resolution of adoption proceedings, we find it necessary to explain the applicability of our decision in this action to other cases. ▮▮▮ "The general rule that judicial decisions are given retroactive effect is basic in our legal tradition." (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) We have also recognized, however, that narrow exceptions to the general rule of retroactivity may sometimes be justified for compelling reasons of fairness and public policy. (*Id.*, at p. 983.) No such reasons warrant any exception to a retroactive effect of our present decision. Our decision shall be given retroactive effect as to all cases not yet final as of the date this decision is filed.

Of course, even retroactive decisions generally do not extend to cases in which final judgments have already been entered. (*Newman* v. *Emerson*

*Radio Corp., supra*, 48 Cal.3d at p. 993 [allowing retroactive effect in cases not yet final]; *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164] [declining to apply new rule of law to final adjudications].) In such a case the time for an appeal will have passed, so there can be no direct attack on the judgment. Similarly, "[H]abeas corpus may not be used to collaterally attack a final nonmodifiable judgment in an adoption-related action where the trial court had jurisdiction to render the final judgment." (*Adoption of Alexander S.* (1988) 44 Cal.3d 857, 867-868 [245 Cal.Rptr. 1, 750 P.2d 778]; see also *Lehman* v. *Lycoming County Children's Services* (1982) 458 U.S. 502, 513-514 [73 L.Ed.2d 928, 938-939, 102 S.Ct. 3231] [holding that federal habeas corpus could not be used to litigate constitutional claims in child custody matters].) Our decision shall therefore have *no* effect in adoption proceedings in which a final judgment has been entered. Such judgments cannot be challenged either directly or collaterally.

## DISPOSITION

We reverse the judgment of the Court of Appeal with directions to remand to the superior court for further proceedings consistent with our decision.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the result only. My concern for the welfare of the child in cases of this sort prevents me from joining the majority's reasoning.

The majority declare that Civil Code section 7004, a provision of the Uniform Parentage Act enacted in 1975, is unconstitutional as applied. The soundness of their determination is open to serious question. Its potential for mischief is not. It creates needless uncertainty in the application of statutory categories that have been consistently employed for almost 20 years. Such uncertainty will redound to the disadvantage of all parties—but especially the child.

The majority yield to the lamentable temptation to invoke the Constitution when there is a perfectly simple legal solution to the factual problem of this case. It is settled law that we should not reach constitutional questions unless absolutely required. (*People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].) The majority invoke the equal protection clause as a first resort rather than a last, without considering how trifling with a statute that has been used without challenge for nearly two decades may affect countless parents and children.

I can understand the motive of the majority: to attempt a just result under the purported factual circumstances of this case. That does not justify, however, in effect throwing out the innocent baby with the statutory bath water. There is a much cleaner solution.

Though the facts are disputed, assume, arguendo, that in this case they can be established at trial. The biological father engaged in an adulterous relationship with the mother. A child was born. Though he had rejected the mother and returned to his wife, the biological father conceded paternity, made reasonable efforts to ascertain the whereabouts of the child and indicated a willingness to take the child into his home and to support it. In short, the biological father allegedly sought to become a presumed father within the statutory requirements of Civil Code section 7004, subdivision (a)(4), but was thwarted from achieving that status through the purported devious actions of the mother.

Under those circumstances, if established by a preponderance of evidence in court, I would estop the mother and the proposed adoptive parents from denying that the biological father had assumed the status of a presumed father. These are paradigm circumstances for the imposition of an estoppel. As Witkin observes, an estoppel deprives a defendant of her defense because of her own objectionable conduct. (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 523, p. 550.) Evidence Code section 623 also refers to estoppel by conduct.

Generally speaking, equitable estoppel is a rule of fundamental fairness by which a party is precluded from benefiting from conduct designed to prevent determination of the truth and a resolution based thereon. While often applied in commercial transactions, equitable estoppel has also been invoked in domestic relations cases. (See, e.g., *Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, 662 [11 Cal.Rptr. 707, 90 A.L.R.2d 569] [declaring that "under some circumstances the husband would be estopped to assert the illegitimacy of the child and thereby avoid liability for its support"] (per Tobriner, J.); *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 842 [126 Cal.Rptr. 38] [to similar effect]; *In re Marriage of Johnson* (1979) 88 Cal.App.3d 848, 852 [152 Cal.Rptr. 121] [same]; *Guardianship of Szwed* (1990) 221 Cal.App.3d 1403, 1415 [271 Cal.Rptr. 121] [mother's husband estopped from relying on statutory presumption of paternity when he had previously admitted he was not the biological father].)

To my mind, the choice between a declaration of unconstitutionality and a use of the doctrine of equitable estoppel is clear. The latter will yield justice for the party if he deserves justice in this individual action without providing

a precedent that has the potential to produce unfortunate results in countless other proceedings, even those previously concluded.

The leading United States Supreme Court case of *Lehr* v. *Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985], makes it abundantly clear that the issue is purely and simply factual. Said the court, at page 262 [77 L.Ed.2d at page 627]: "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for his child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."

Accordingly, I would remand the cause to the trial court for factual proceedings consistent with this opinion.