74 Cal.Rptr.2d 920 (1998)
64 Cal.App.4th 532
In re JULIA U., a Person Coming Under the Juvenile Court Law.
SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
RAMON O., Defendant and Appellant.
No. B117162.
Court of Appeal, Second District, Division Six.
June 3, 1998.
*922 Mitchell L. Beckloff, under appointment by the Court of Appeal, Los Angeles, for Defendant and Appellant.
James B. Lindholm, Jr., County Counsel, Mary A. Toepke, Deputy County Counsel, for Plaintiff and Respondent.
STEVEN J. STONE, Presiding Justice.
Ramon O., an unwed father, appeals the trial court's orders denying his Welfare and Institutions Code section 388 petition[1] and terminating his parental rights over the child Julia U. (Julia) pursuant to section 366.26. We reverse the orders on the ground the trial court denied him his parental rights without due process.

FACTS
Julia was born to 14-year-old Trisha C. on August 11, 1996. Trisha was a juvenile court dependent. Respondent worked with Trisha to find foster care placement where she could have with Julia. Respondent soon came to believe that Julia needed protection from Trisha, and on October 3, 1996, filed a section 300 petition for the infant.
The petition stated that Trisha had emotional and mental problems which interfered with her ability to meet Julia's needs. The petition also stated that Julia's presumed father was Jose U., an adult with an extensive criminal history. Jose U. was listed as Julia's father on her birth certificate. He denied paternity.
Respondent filed an amended petition stating that Trisha was now committed to parenting Julia and wanted to have Julia placed with her.
At a jurisdictional hearing on November 4, 1996, Jose U. was present in court; he was then in custody on criminal charges. The court ordered appointed counsel and paternity testing for him. The dispositional hearing was continued to December 23, 1996.
In the meantime, Julia was placed with Trisha in Trisha's foster home.
Paternity testing was completed on December 2, 1996.
On December 23, 1996, the trial court sustained Julia's section 300 petition and declared her a court dependent. Julia was removed from Trisha's legal custody, but permitted to continue residing with Trisha as long as Trisha remained in foster care. The paternity test results completed in December showed that Jose U. was not Julia's biological father.
Respondent filed a section 387 petition on March 7, 1997. The petition was filed because of Trisha's rough treatment of Julia and the need to place the infant in emergency shelter. The petition stated there was "no available father as the previous alleged father has been ruled out as the biological father in a recent paternity test. A new alleged father has been named but not located as of yet." Attached to respondent's papers was a December 20, 1996, letter from the district attorney's family support division stating that Jose U. was not Julia's father, and Trisha needed to name another possible father. Respondent's March 10, 1997, detention report again stated that "[t]he new alleged father has not been located."
On March 26, 1997, respondent filed a section 388 petition requesting termination of Trisha's physical custody over Julia and the implementation of a family reunification plan. The petition mentioned appellant's name for the first time and an address for him in Oceano. Respondent stated appellant's current whereabouts were unknown.
On March 27, 1997, the trial court acknowledged that the DNA testing showed Jose U. *923 was not Julia's biological father. The court relieved Jose U.'s appointed attorney. The court subsequently ordered suitable placement for Julia away from her mother and set a jurisdictional/dispositional hearing for April 14, 1997. The hearing was continued to April 28 and then to May 19.
On May 16, 1997, respondent filed another section 388 petition stating that Trisha had relinquished her parental rights on May 7, and requesting that reunification services be terminated "for the mother and the alleged fathers and the matter referred to a § 366.26 hearing." Respondent listed appellant's name as Julia's "father" and Rueben G. as her "[a]lleged father." The petition stated, "The second alleged father, [appellant], has informed this social worker of his intent to submit to a paternity test ... [which] will be arranged for him. While [appellant] is willing to take a paternity test, he has no established relationship with the minor. The mother has recently provided the name of a third alleged father, Rueben [G.]. He has denied paternity and also has no established relationship with the minor." A detention report accompanying the petition stated that appellant "would like the opportunity to reunify with Julia should he be shown to be the biological father.... [¶] A third alleged father has been named by Trisha. Rueben [G.] is currently in custody at the Juvenile Services Center in San Luis Obispo. Rueben's probation officer ... states that Rueben vehemently denies that he is the father of Julia."
Appellant voluntarily appeared in superior court on May 19, 1997, and stated his commitment to Julia if she was his daughter. The court ordered him to submit to paternity testing. The court would not appoint counsel to represent him until paternity testing was completed. The court ordered a section 366.26 hearing for September 15, 1997, pursuant to respondent's request.
Before paternity testing was conducted for appellant, the trial court on May 27 terminated all reunification services. The court determined appellant had not established his paternity or a relationship with Julia.
On June 16, respondent reported to the court that appellant's paternity testing had not occurred since a court order was needed to get appellant's mother to sign the stipulation for his blood testing due to his status as a minor. The court ordered the upcoming paternity hearing to be conducted on the same day of the section 366.26 hearing.
In its August 11 section 366.26 hearing report, respondent stated appellant first came to its attention on February 25, 1997, when Trisha told her social worker that appellant was possibly Julia's, father. Trisha did not know appellant's address, but stated his mother, Delia C, lived in Oceano. Trisha also told appellant's mother in February that appellant could be Julia's father. On March 26, 1997, Trisha's social worker learned appellant had a history with the county sheriffs office. The social worker spoke to the sheriffs office on April 8 and was given appellant's mother's address in Oceano. On April 14, the social worker spoke to Delia C, who stated appellant lived in Arizona. On April 16, Ms. C. visited respondent's office and stated she did not want her son to be financially responsible for Julia. Beginning May 3, appellant began contacting Julia's social worker, indicating his interest in the infant. However, respondent stated in its report, "[appellant] has not contacted this social worker ... at any time to ask for visits or to inquire as to the well-being of Julia. As far as this department knows he has never had a visit with the minor. He has made no significant attempt to establish a relationship with his daughter, even though he knew as early as February 1997 that he may be the father."
At a special paternity hearing on August 25, 1997, the trial court announced the paternity testing revealed appellant was Julia's father. Appointed counsel for appellant was at the hearing. The court ordered counsel to determine what appellant's "status at future hearings" should be and "whether [appellant] should be able to do anything more in this matter than observe."
At another special hearing on September 8, appellant's appointed counsel asserted that reunification services should be provided. The court told counsel it would consider a section 388 petition by appellant. The court *924 denied counsel's request for visitation between appellant and Julia.
On September 22, appellant's counsel filed a section 388 petition seeking to have appellant declared Julia's presumed father, and requesting that appellant be provided with reunification services and physical custody of Julia.
Appellant's petition alleged: "[Appellant] had a casual relationship only with Trisha [C.]. They engaged in intercourse only two times. [Appellant] knew that she was pregnant, but was told and believed that the baby belonged to Jose [U.]. [¶] On February 25, 1997 Trisha [C] told [the social worker] that [appellant] was possibly Julia's father, [¶] [The social worker] did not attempt to contact [appellant] for almost two months after learning this fact.... [¶] On April 14, 1997, [the social worker] contacted [appellant's] mother, Ms. [C], who told her [appellant] was in Arizona. [The social worker] told Ms. [C] that she would try to arrange for the blood test in Arizona. Ms. [C] did not hear from [the social worker] for a few weeks and finally called [the social worker] herself. [The social worker] told her that she had not yet done anything about arranging the blood test, [¶] [Appellant] called [the social worker] on May 3, 1997 and requested a blood test for paternity. [The social worker] assured him that he had plenty of time to take the test.... [¶] [The social worker] did not call [appellant] until 8:30 a.m. the day of [respondent's section] 388 hearing on May 19, 1997 to inform him of the hearing. [Appellant] appeared at the ... hearing and stated that if Julia was his he wanted her. [¶] [Appellant] called several times to ask why it was taking so long to do the paternity test. The District Attorney's office did not schedule the paternity test until June 30, 1997.[¶] No one from Social Services ever mentioned to [appellant], who is only 17, that he could see Julia or contact her.... [¶] The District Attorney's office did not notify [appellant] until August 15, 1997 of the results of the blood test, six days after the date on the test result report of August 9, 1997.... [¶] [Appellant] has attempted to visit with [Julia], but has not been allowed to see her."
The trial judge denied appellant's section 388 petition on the grounds that "... it is in the minor's best interest for me to deny reunification services at this time given the present posture of the case and the lack of significant effort by [appellant] to establish a relationship with this child, [¶] [Appellant] is certainly not a presumed father based on all of the evidence before the court...." The court relieved appellant's counsel, and reset the section 366.26 hearing for October 20.
On October 20, the court terminated appellant's parental rights.
Appellant timely appealed from the court's order denying his section 388 petition. He also timely appealed from the court's order terminating his parental rights. We consolidated both appeals.

DISCUSSION

Appeal
Respondent argues appellant is foreclosed from appealing the trial court's orders denying his section 388 petition and terminating his parental rights. We disagree.
Respondent relies on California Rules of Court, rule 39.1B which states: "(d) [Limitations of Appeal] The findings and orders Of the juvenile court in setting a hearing under section 366.26 may be reviewed on appeal following the order of the 366.26 hearing only if the following have occurred: [¶] (1) An extraordinary writ was sought by the timely filing of Judicial Council form Writ Petition... or other petition for extraordinary writ; and [¶] (2) The petition for extraordinary writ was summarily denied or otherwise not decided on the merits .... [¶] (e) [Failure to File a Petition for Writ; Precludes Appeal] Failure by a party to file a petition for extraordinary writ review as specified in this rule shall preclude that party from obtaining subsequent review on appeal of the findings and orders made by a juvenile court in setting a hearing under section 366.26." (See also Cal. Rules of Court, rule 1436.5(b), (c).)
Respondent argues that here the trial court ordered a section 366.26 hearing at the time it denied appellant's section 388 petition. *925 Since appellant filed no request for an extraordinary writ, the issues relating to his section 388 petition are foreclosed for review.
Respondent's argument is disingenuous. The trial court ordered a section 366.26 hearing on May 19, 1997, long before it gave permission to appellant on September 8 to file a section 388 petition. At the hearing denying appellant's section 388 petition, the trial court merely reset the previously ordered section 366.26 hearing.
As appellant states, he properly appealed the denial of his section 388 petition. (§ 395.) Rule 39.1B is inapplicable.

Constitutional Rights
Appellant contends the trial court's orders unconstitutionally deprived him of his parental and due process rights. We agree that the trial court improperly refused him reunification services.[2] In so holding, we analyze the specific roles and responsibilities of the parties herein, as enunciated by our Supreme Court in In re Zacharia D. (1993) 6 Cal.4th 435, 24 Cal.Rptr.2d 751, 862 P.2d 751 (Zacharia D.). Zacharia D. dealt with the same issue before us: whether a biological, unwed father is entitled to reunification services.
Only a "presumed" father, not one who is merely a "natural" father, is entitled to reunification services. (Zacharia D., supra, 6 Cal.4th at pp. 439, 448-449, 451, 24 Cal.Rptr.2d 751, 862 P.2d 751.) In order to become a presumed father, a father must fall within one of several categories enumerated in Family Code section 7611 (formerly Civ. Code, § 7004).[3] (Id., at p. 449, 24 Cal. Rptr.2d 751, 862 P.2d 751.) As in Zacharia D., the only relevant category here is subdivision (d) of Family Code section 7611 (formerly Civ.Code, § 7004, subd. (a)(4)), which requires a natural father to "receive[] the child into his home and openly hold[] out the child as his natural child." (Ibid.) Appellant is an unwed father. If an unwed, biological father promptly comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. (Id., at p. 450, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
In determining whether a biological father has demonstrated such commitment, the father's conduct both before and after the child's birth must be considered. (Zacharia D., supra, 6 Cal.4th at p. 450, fn. 19, 24 Cal.Rptr.2d 751, 862 P.2d 751, citing Adoption of Kelsey S. (1992) 1 Cal.4th 816, 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. (Ibid.) In particular, the father must demonstrate a willingness himself to assume full custody of the childnot merely to block adoption by others. (Ibid.) A court should also consider the father's *926 public acknowledgment of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child. (Ibid.)
The Supreme Court decided in Zacharia D. that the natural father was precluded from attaining presumed father status. (6 Cal.4th at p. 451, 24 Cal.Rptr.2d 751, 862 P.2d 751.) The father had engaged in at least a dozen acts of sexual intercourse with his child's mother over a two-week period. There was no evidence that he had any reason to expect this sexual relationship had not resulted in pregnancy. There also was no evidence the mother ever hid herself, her pregnancy, or their child from the father. The father knew where the mother was living and could have found her. The father and mother had known each other many years, had been high school sweethearts, and eventually married. The father waited until the 18-month dispositional hearing to assert his parental status. The father's ignorance of his child's existence was not born solely of the father's indifference. (Id., at p. 452, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
The facts pertaining to appellant differ significantly from those relating to the father in Zacharia D. The record indicates appellant had no more than a casual relationship with Trisha and they had sexual intercourse only twice. Before becoming pregnant with Julia, Trisha was engaging in multiple acts of sexual intercourse with varying persons. She named three males as Julia's alleged father. Based on Trisha's promiscuity and appellant's casual relationship with her, the evidence is weak that he had reason to expect his sexual activity with Trisha would result in her pregnancy. According to appellant, he did know Trisha was pregnant, but believed the father was Jose U. Moreover, Trisha did not inform anyone of appellant's possible parentage until it was determined that Jose U. was not Julia's father.
Appellant was the only alleged father who did not deny or reject his paternity. From his initial contact with respondent, he publicly expressed his desire to establish a relationship with Julia if the paternity test showed he was her biological father.
Appellant also did not delay in asserting his interest in Julia. Respondent argues appellant knew about his alleged parental status in February 1997, yet did not promptly demonstrate his commitment to his parentage and did not request visitation with Julia until the September 8, 1997, paternity hearing.
To the contrary, appellant alleged without contradiction that respondent denied his requests for visitation. Furthermore, the record shows appellant was in contact with respondent by May 3, only a few weeks after respondent's failure to reach him at his mother's address. By May 19, appellant had left Arizona to live with his mother in Oceano, and was in court asserting his commitment to a parental relationship with Julia. Despite his interest, appellant did not receive appointed counsel before his paternity test, as did Jose U. who, unlike appellant, denied his paternity. Due to his young age and lack of finances, appellant reasonably may have been precluded from participating in the case until September 8 when appointed counsel for him was first allowed to be present in court.
The record does not establish that appellant was indifferent to Julia's existence; quite the contrary. He had no opportunity to develop a parental relationship with Julia; visitation with her was denied both by respondent and the trial judge.
Respondent, moreover, was dilatory in performing its obligation to locate Julia's natural father. (Zacharia D., supra, 6 Cal.4th at pp. 452-453, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
It is true that respondent had no reason to suspect Julia had an absent father until the paternity testing revealed Jose U. was not her parent. Up until that time, Trisha did not inform respondent of any other alleged fathers. In addition, although Jose U. denied his paternity, he was named as Julia's father on her birth certificate. Once a presumed father has been identified, the social services agency is not expected to wait for other potential fathers to come forward. *927 (Zacharia D., supra, 6 Cal.4th at p. 463, 24 Cal.Rptr.2d 751, 862 P.2d 751.)
Respondent's delay in ascertaining appellant's existence and paternity began when test results showed Jose U. was not Julia's father. It took respondent three months (from December 1996 to March 1997) to inform the court that Jose U. was not Julia's father. Moreover, when Trisha first informed respondent in February 1997 that appellant or another individual, Rueben G., might be Julia's biological father, respondent made no attempt to contact appellant until two months later in April 1997, even though knowing his mother's name and the city where she lived. Also, according to appellant, when he notified respondent in early May that he wanted to take a paternity test, respondent told him there was plenty of time to conduct a test. In June, respondent notified the court that a special order was needed for appellant to take the test due to his minority status. The test apparently was conducted in July or August, three or four months after appellant requested the test, and about two to three months after the trial court terminated all reunification efforts for Julia pursuant to respondent's request.
Respondent's delay in establishing appellant's paternity was unreasonable. Its initiation of proceedings to terminate reunification services was without justification.
As did respondent, the trial court here focused solely on Julia's best interests. Appellant's recognizable interest in his parentage was overlooked.
Sections 366.21 and 366.22 require that if a child may not safely be returned to the child's parents within a maximum of 18 months from removal from the parents' care, the trial court must terminate reunification efforts and set a section 366.26 hearing. (Zacharia D., supra, 6 Cal.4th at p. 447, 24 Cal.Rptr.2d 751, 862 P.2d 751.) Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parents' custody. (Ibid.) The proceeding terminating reunification services and setting a section 366.26 hearing is usually the parents' last opportunity to litigate the issue of parental fitness as it relates to any subsequent termination of parental rights, or to seek the child's return to parental custody. (Ibid.) Up until the time the section 366.26 hearing is set, the parents' interest in reunification is given precedence over a child's need for stability and permanency. (Ibid.)
The trial court here set a section 366.26 hearing on the same day appellant first appeared in court and paternity testing was ordered. One week later, the court terminated all reunification services in the case, including any for appellant. The court did not wait to determine if the testing revealed appellant was Julia's biological father. Nor did the court give appellant the same opportunity to counsel as the court gave Jose U., an alleged father who, unlike appellant, denied his paternity. Nor did the court give appellant any opportunity to establish his right to paternity.
When appellant first appeared in court on May 19, 1997, Julia had been removed from Trisha's physical care for only two months. There was still time for the court, prior to terminating reunification services, to await appellant's paternity test results and to give him an opportunity to visit with Julia. Then, if the testing revealed he was Julia's biological father, there was still time for the court to offer him reunification services to determine his fitness as a parent. Unlike Jose U., appellant was not incarcerated or otherwise unavailable to learn parenting skills.
The trial court's refusal to allow appellant the opportunity to prove his presumed father status and his fitness as a parent contravenes the statutory dependency scheme.
Appellant's federal constitutional rights also were violated. He has the fundamental due process right to notice and an opportunity to be heard on the custody and care of his child. (In re B.G. (1974) 11 Cal.3d 679, 688-689, 114 Cal.Rptr. 444, 523 P.2d 244; In re Steve W. (1990) 217 Cal. App.3d 10, 27, 265 Cal.Rptr. 650.) Here, the termination of reunification services occurred prior to any consideration by the trial court of appellant's commitment to Julia and his fitness as a parent.
*928 Appellant also has the fundamental right to parent his child. (In re Carmaleta B. (1978) 21 Cal.3d 482, 489, 146 Cal.Rptr. 623, 579 P.2d 514.) The right to parenting should only be disturbed in extreme cases of persons acting in an incompatible fashion with parenthood. (Ibid.) The relationship of a natural parent and a child is a vital human relationship which has far-reaching implications for the growth and development of the child. (Ibid.) The involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment. (Ibid.)
We reverse the trial court's orders terminating reunification services for appellant and terminating his parental rights.
GILBERT and YEGAN, JJ., concur.
NOTES
[1] All statutory references henceforth will refer to the Welfare and Institutions Code unless otherwise cited.
[2] We need not decide the issue of whether appellant is entitled to custody of Julia, a second issue he raised in his section 388 petition. Since the issue of appellant's fitness as a parent was not litigated, we have no foundation for assessing his competence to have custody of Julia.
[3] Family Code section 7611 provides: "A man is presumed to be the natural father of a child if he meets the conditions ... in any of the following subdivisions: [¶] (a) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court. [¶] (b) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce. [¶] (2) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation, [¶] (c) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and either of the following is true: [¶] (1) With his consent, he is named as the child's father on the child's birth certificate. [¶] (2) He is obligated to support the child under a written voluntary promise or by court order. [¶] (d) He receives the child into his home and openly holds out the child as his natural child."