[No. B187823. Second Dist., Div. One. June 26, 2006.]

In re BABY BOY V., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
JESUS H., Defendant and Appellant.

**COUNSEL**

Lisa A. DiGrazia, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Lisa Proft, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**VOGEL, J.**—A baby born to a drug addicted mother and an "identity unknown" father became a dependent of the juvenile court and was placed in foster care. Eight months later, the "alleged" father learned of the baby's existence, went to see the social worker, appeared in court as directed, asked for a paternity test, and stated his desire to support and care for the child he believes is his. The dependency court, determined to proceed as planned before the man's appearance, denied the request for a paternity test and terminated parental rights as to the "identity unknown" father as well as the man who appeared in court. We reverse.

## FACTS

### A.

Gladys V. has four children, the youngest of whom (Baby Boy V.) is the subject of this appeal. The two oldest children, Richard V. (born in May 1999) and Alexa V. (born in November 2000), have the same father, Lorenzo A. Gladys K. (born in December 2002) has a different father (Anthony K.). Four

hours after Baby V. was born (in February 2005), Gladys V. walked out of the hospital after telling a social worker she knew the baby would be taken by the Department of Children and Family Services because the other three children were then dependents of the court and because she knew or suspected that Baby V. had tested positive for methamphetamines and amphetamines. Gladys V. did not give the hospital the name of Baby V.'s father.

The Department filed a petition, alleging that Gladys V. had a long history of drug abuse that rendered her unable to care for Baby V., and that she had failed to reunite with her three older children. (Welf. & Inst. Code, § 300, subds. (b), (j).)[1] At a hearing held on February 16 (at which Gladys V. did not appear), the Department reported that the identity of Baby V.'s father was unknown, and recommended placement with Gladys K.'s prospective adoptive parents. The dependency court followed the recommendation and ordered the Department to try to find Baby V.'s father. Gladys V. appeared at a February 25 hearing, at which time the court asked her, "Do you want to give us the names of the people you think . . . might be [the father] . . . ." When Gladys declined, the court ordered her to talk to the Department and to give the social worker the names of anyone who might be Baby V.'s father. Gladys never complied.

In a report prepared for a March 17 hearing, the Department included a declaration of due diligence, explaining that 15 "search source[s]" had been identified, but that a "search [was] not possible" because the "father's identity [was] unknown."[2] On March 17, the court sustained the petition. On April 7, the court denied reunification services for Gladys V. and for Baby V.'s unidentified father. The court set a permanent plan hearing for July 7, and ordered the Department to give notice to the "identity unknown" father by publication. On July 7, the court found the published notice inadequate and continued the hearing to November 3.

**B.**

Meanwhile, on September 29, Jesus H. appeared at the Department's office and said he was probably Baby V.'s father. He told the social worker he had

[1] Undesignated section references are to the Welfare and Institutions Code, and all rule references are to the California Rules of Court.

[2] There are no names at all in any of the information about the search. These are the search sources: Prison. Marines. Navy. DMV. Relatives/Friends. CWS/CMS. Postal Service/Last Known Address. CYA. County Jail. Probation/Parole. Voter Registration. Air Force. Army. WCMIS. Coast Guard. As to each, the Department report shows the same date (March 8, 2005), the same description of the "search" ("Record search not possible" because "father's identity is unknown"). In short, there was no search.

been in an intimate relationship with Gladys V., and that she had just told him about the baby and told him to talk to the social worker. He said he wanted family reunification services and was willing to comply with all of the court's orders. The social worker gave him a copy of the notice of the hearing set for November 3, told him the purpose of the hearing was to terminate parental rights, and explained that it was mandatory for him to be present at the hearing—but denied his request to visit Baby V. and did not do anything to inform the court that the baby's apparent father had come forward.

Jesus appeared at the November 3 hearing and a lawyer (Eric Wexler) was appointed to represent him. The court told Jesus, "Basically the mother has never given your name as the possible father of this child, ever." Mr. Wexler explained that Gladys V. had told Jesus "the baby looked like him," and that Jesus had contacted the social worker as soon as he learned about the baby's birth. Mr. Wexler asked for an H.L.A. test to determine paternity.[3] This was the court's response: "He's an alleged father. Notice is proper. We're going forward with the [section 366.]26 [hearing] today. There's no exception. There's no reason not to terminate parental rights."

When Mr. Wexler suggested it would be in the baby's best interests to determine paternity, Baby V.'s lawyer agreed, as did the Department's lawyer. The court's response? "Why wouldn't you just go forward today? If you terminate the parental rights, that's the end of him. . . . I mean are you going to, like, move him into this guy's home when he's in a preadoptive home? What are you trying to do by doing that?" The court repeated, "I just don't see the point." There followed a debate about whether published notice to the "identity unknown" father was sufficient notice to Jesus, after which the court faulted Jesus for not visiting Baby V. Mr. Wexler explained that Jesus had wanted to visit but the Department would not permit it, and asked for reunification services (as well as the paternity test) for Jesus.

The court questioned the need for a paternity test: "What if he's the father? Then we're going to offer him [reunification services]?" The minor's lawyer (who had at first agreed that a paternity test was appropriate) then questioned Jesus's presence and when pressed by the court said she had no good reason for joining in the request for the test, suggesting "maybe the father would have a reason." The court again said they should just go forward because Jesus had had no contact with the child and because the court did not know if "it's even his child." There followed a conversation about the insufficiency of service on Jesus notwithstanding "substantially correct" published service for the "identity unknown" father, followed in turn by Mr. Wexler's repeated

---

[3] The lawyers and court refer sometimes to an H.L.A. test, other times to a DNA test. We presume there is a standard test used to determine paternity.

requests for a paternity test. This was the court's response: "All the objections are overruled. I think they're makeweights. They aren't in the child's best interest if there was some person we were trying to serve, I would agree that person would have standing and have a real objection. You know, Casper the Friendly Ghost, identity unknown, does not have standing. We don't know who it is. There's no real person. This may be the gentleman; it may not be the gentleman. He's been timely served. He has no basis to contest it at this point, so I feel it would be in the child's best interest to proceed, so I'm overruling everyone's objection."

When the lawyers finally persuaded the court that there was a defect in the service on Jesus, the court put the matter over to November 28: "Dad's advised that the hearing is going over to November 28th. Court at that time will be terminating parental rights. The baby's been with a family that wants to adopt him. They have a home study to adopt him. [¶] Given that this is child 4 on this case, I can't find that it would be in the child's best interest to even test to see if you are the father. I don't think you are." The court's comments are difficult to understand because Jesus had nothing at all to do with Gladys's other children (the record is clear that he is not their father). The court's last comment—"I don't think you are [the child's father]"—is equally odd because there is nothing at all to suggest that Jesus is not the baby's biological father.

### C.

Jesus and his lawyer appeared at the November 28 hearing, at which there was the following exchange:

"MR. WEXLER: . . . [Jesus], when he learned that the child was actually in existence . . . he had a relationship with the mother. The mother went into a drug rehab program. *He didn't meet with [the] mother again until September of this year, and that's when he found out that [the] mother had a baby and that he was probably the father.* [¶] He met with the social worker and told the social worker that, and he requested an H.L.A. . . . because he wants to have a relationship with his child.

*"He has another child that he supports. It's a little girl [who] he sees weekly. He supports the mother and . . . that child. [¶] He has a full-time job. He's had the same job for eight years. He's a very stable man, and his words with me w[ere] he did not want to throw this child back into the river when the child has a father [who] would take care of him, that wants to raise him, and will provide for him the rest of his life, so he would ask for a chance to have a relationship with his child . . . .* [¶] I know we're late as far as the

time frames go in this case. I think the [social] worker should have brought this to court immediately instead of making him wait an extra month before he came to court.

"THE COURT: We published on him in June.

"MR. WEXLER: Doesn't mean he saw it, Your Honor.

"THE COURT: I understand. But I'm saying he's been gone so long that we actually got publication on him in June as an A.K.A. for the father. [Jesus] was one of the published names, I believe.[4]

"MR. WEXLER: This is a case where the mother didn't want the baby and basically was doing everything, I think, to make sure no one got the baby.

"THE COURT: Well, that very well may be. Okay. So how do you wish to proceed? This child is going to be two years old in February.[5] He was living with a family [with] an approved home study. [¶] . . . [¶]

"[THE DEPARTMENT'S COUNSEL]: On November 3rd, Mr. Wexler asked for an H.L.A. test. [The] court found that it wasn't in the child's best interest. The court put the case over until today so that the notice to [Jesus] would be at least 45 days. [¶] . . .

"[BABY V.'S COUNSEL]: And the child, your honor, will be, I believe, one in February, just for the record. [¶] . . . . [¶] . . . Your Honor, I would ask that we proceed. I know that there is case law indicating that when a father creates a child that it is his responsibility to be informed of the child's existence and to avail himself, if that's necessary. This child is placed with a sibling and has been with this caretaker since the detention, and I'd ask that we go forward since notice is proper at this time. She has an approved home study.

"[THE DEPARTMENT'S COUNSEL]: And I would join with [the child's lawyer], and I don't believe that . . . the alleged father is entitled to a contest or to cross-examine the worker. I'd ask that we go forward.

"THE COURT: Okay. Well, I'm sorry that mother was such a rat to dad and didn't let him know when she became pregnant . . . . This is child 4 that mother has not taken care of,[6] but I don't think it's in the child's best interest

---

[4] There are no names mentioned in the order for publication or in the published notice.

[5] In fact, the baby would be one year old in February.

[6] As noted above, Baby V. is Gladys V.'s fourth child, but the other three children had different fathers.

to be taken away from his brother [*sic*] in the home he's had to go—and then you want an H.L.A. because maybe its yours and maybe it's not because we don't even know if it is your child, you just think it's your child, so I don't—I think at this stage in the proceedings it's not appropriate to continue the case, so I'm going to overrule the father's objection.

"Court finds that continued jurisdiction of this little boy is necessary . . . . [¶] I've read and considered the 26 report . . . and find[] by clear and convincing evidence that the baby's adoptable and likely to be adopted. He's placed with caretakers who are willing to adopt him and who have adopted one of his siblings already and now want to have the children together as a family. The court finds it would be detrimental for the child to be returned to his parents.

"His mother's whereabouts [are] unknown, and he has never seen his . . . alleged father who may or may not be his father, so at this time the parental rights of the mother Gladys [V.] . . . and the identity-unknown father also known as Jesus [H.] . . . and anyone else claiming to be the parents of this child are now terminated, and this child is declared free from the care, custody and control of his parents . . . ." (Italics added.)

Jesus appeals from the order terminating his parental rights.

## DISCUSSION

### I.

We begin by rejecting the Department's procedural challenges to Jesus's appeal.

### A.

First, we reject the Department's contention that Jesus's notice of appeal restricts the scope of our review. Jesus's handwritten pro se notice of appeal states: "I, Jesus [H]. appeal to the findings of this court because I believe that I was not given the opportunity to prove that I am the biological father thru a DNA test." The Department suggests the absence of an express reference to the order terminating parental rights is fatal to Jesus's challenge to that order. We disagree. The notice—which must be liberally construed—plainly challenges the "findings" of the dependency court, all of which (including the termination order) follow from the refusal to grant Jesus's request for a paternity test. Our review is not limited. (Rule 1(a)(2); *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361 [54 Cal.Rptr.2d 689].)

## B.

Second, we reject the Department's contention that Jesus waived his right to request presumed father status because he did not expressly request it below. What more was the man supposed to do? It is uncontroverted that, as soon as he learned that Gladys V. had been pregnant and had given birth to a child that was probably his, he went to the Department's office and presented himself to the social worker. Instead of arranging an immediate court appearance, the Department told him to appear at the next scheduled hearing, November 3.

Jesus appeared on November 3 as directed and asked for a paternity test, only to be told by the court that confirmation of his status would be irrelevant because reunification services would not be granted and his parental rights would in any event be terminated. We can only assume that the court was confused and believed that Jesus was somehow the father of the mother's other children, which he was not, and believed that Jesus did not care about Baby V. because he had not visited the child (when in fact Jesus had wanted to visit but was prevented from doing so by the Department). The court denied the request for a paternity test and continued the matter only because of a defect in notice. Jesus appeared at the next hearing and (through counsel) told the court he had a full-time job which he had held for eight years, that he has another child whom he supports, and that he wants to provide for and have a relationship with Baby V.[7] Unimpressed, the court terminated his parental rights and freed the baby for adoption.

While it is true that Jesus did not expressly request presumed father status, a formal request would have been futile—and his omission thus cannot be treated as a waiver of his right to challenge the order denying his request for reunification services. The waiver case relied on by the Department, *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 [207 Cal.Rptr. 728], is inapposite on these facts.[8]

## C.

We summarily reject the Department's Catch-22 contention that Jesus lacks standing to appeal because he "never advanced beyond the status of alleged father . . . ." Whatever merit there may be to the general rule "that an

---

[7] In its respondent's brief, the Department claims Jesus appeared only once, on November 3. Not so. As reflected in the reporter's transcript, he also appeared on November 28.

[8] We treat as specious the Department's suggestion that Jesus should have filed a section 388 petition to raise the issue of presumed fatherhood. When? He was told not to appear until November 3. He appeared, and was not allowed to request anything because he had no status. He was ordered back on November 28. He appeared, but every request he made was denied.

alleged biological father who is not a party of record in the dependency court has no standing to appeal an order terminating parental rights" (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 716 [99 Cal.Rptr.2d 915]), that rule cannot apply here because (1) Jesus appeared at the earliest practical point and attempted to join the proceedings as a party, and because (2) any other result would be nonsensical. In *In re Paul H.* (2003) 111 Cal.App.4th 753, 759 [5 Cal.Rptr.3d 1], the court explained that an alleged father in a dependency proceeding becomes a party when he " 'appear[s] and assert[s] a position.' " (*Ibid.*) Jesus appeared and asserted a position—that he believed he was the father, wanted to confirm his belief with a paternity test, and wanted to know and support his son. Under these circumstances, he has standing. (*Ibid.*)

## II.

Jesus contends he is entitled to presumed father status and, therefore, to reunification services. We agree.

■ On the record before us, it is undisputed that Jesus, a nonoffending, stable, employed, and financially responsible adult, came forward at the earliest possible moment and when the baby had been in foster care for only eight months. It is undisputed that the only reason Jesus did not come forward at an earlier date is that he did not know of the existence of the baby. It is undisputed that the mother would not disclose his identity to the court or to the Department, and that he was thereby prevented from receiving the baby into his home and holding himself out as the baby's father. (Fam. Code, § 7611, subd. (d).) For these reasons, Jesus is entitled to presumed father status. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216] ["a mother [may not] unilaterally . . . preclude her child's biological father from becoming a presumed father[,] thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest"].)

■ When an unwed father learns of a pregnancy and "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 849; *In re Julia U.* (1998) 64 Cal.App.4th 532, 544 [74 Cal.Rptr.2d 920]; *In re Jerry P.* (2002) 95 Cal.App.4th 793, 807 [116 Cal.Rptr.2d 123].)

Because there was nothing in the record to suggest that Jesus is unfit as a parent, he was entitled to presumed father status and, absent the presentation of evidence of unfitness on remand, he is entitled to reunification services and visitation—provided that Jesus establishes on remand that, as represented, he in fact came forward promptly on learning of the baby's existence and otherwise satisfied the requirements of *Adoption of Kelsey S., supra,* 1 Cal.4th at page 849.

## III.

■ Jesus contends the dependency court was required to order a paternity test to determine whether he is Baby V.'s biological father. We agree. Rule 1413(h) (as it read in 2005 at the time of the November 2005 hearings) provided, as relevant: "If a man appears at a hearing in a dependency matter, . . . *or* requests a finding of paternity on Form JV-505 in a dependency matter . . . , the court *shall* determine whether or not he is the biological father of the child." (Italics added.) This is a mandatory, not a discretionary, rule. (§ 15; *County of San Diego v. Bouchard* (1987) 195 Cal.App.3d 34, 39 [240 Cal.Rptr. 391] [the word "shall" is mandatory].) Jesus's request for a paternity test should have been granted.

## IV.

We recognize that Baby V. was placed with his half sister's adoptive parents, and we realize that his foster parents want to adopt him. Had Jesus not learned about the baby and come forward, it seems that adoption would have been in the baby's best interests. But Jesus did come forward and attempt to do the right thing by offering to provide emotional and financial support and a home for the child he believes is his, and Jesus's interests must also be considered, not just the child's interests. (*In re B.G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244] ["the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights"];*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 251 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; *Adoption of Kelsey S., supra,* 1 Cal.4th at p. 849; *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1060 [43 Cal.Rptr.2d 445, 898 P.2d 891].)

Here, Jesus's parental rights were ignored either in the interests of efficiency or in a misguided effort to act in the child's best interests, which is not how the system is supposed to work. It bears noting that a more thoughtful approach to Jesus's requests, whatever the outcome of the paternity test, could probably have saved the child, the prospective adoptive parents, and Jesus a lot of heartache, not to mention the better part of a year wasted before these proceedings are properly resolved.

## DISPOSITION

The orders denying Jesus's request for a paternity test and terminating his parental rights are reversed, and the cause is remanded to the dependency court with directions (1) to transfer the case to a judge other than the judge whose orders are the subject of this appeal (Code Civ. Proc., § 170.1, subd. (c)), (2) to *immediately* conduct a hearing to determine whether Jesus came forward promptly after learning of the baby's existence and otherwise satisfied the requirements of *Adoption of Kelsey S., supra,* 1 Cal.4th at page 849, and, if he did, to *immediately* order a paternity test and, if he is the biological father, (3) to investigate Jesus's fitness and, unless he is unfit, to provide him with reunification services and visitation, (4) to consider anew all issues about the appropriate permanent plan for Baby V., and (5) to make such other orders as may be necessary and appropriate. The clerk of our court is directed to mail a copy of this opinion to the Presiding Judge of the Los Angeles Superior Court.

Mallano, Acting P. J., and Rothschild, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 11, 2006, S145553. Kennard, J., was of the opinion that the petition should be granted.