Filed 4/9/26  In re G.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re G.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087236 |
| | (Super.Ct.Nos. J296360 & J296361 & J302895) |
| Plaintiff and Respondent, | |
| v. | OPINION |
| S.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant, T.B.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, S.M.

Laura Feingold, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

This is an appeal taken by S.M. (mother) and father Tommie B. from the orders of the San Bernardino County juvenile court terminating their parental rights as to their children at a Welfare and Institutions Code section 366.26 permanent plan selection hearing.[1]

The sole issue before us is whether the juvenile court erred when it denied mother's request to testify at the section 366.26 hearing. We will affirm.

## BACKGROUND

Mother has four children, K.M. (born in Nov. 2015), T.G. (born in Aug. 2021), G.G. (born in Dec. 2022) and Baby Boy (also known as K.B., born in Nov. 2024). Tommie B. is the biological father of T.G. and Baby Boy. D.G. is the presumed father of G.G. (father D.G.) and K.M.'s father is Robert B.

The family came to the attention of respondent San Bernardino County Children and Family Services (the Department) in March 2023 when mother tried to steal $1,000 worth of merchandise from Target and attempted to assault one of the store's employees with a shopping cart with two-month-old G.G. in the cart. Mother did not tell the responding deputy sheriffs that seven-year-old K.M. and one-year old T.G. were in the car even when she knew she was being arrested. Those children were discovered after the deputies took mother's car keys and clicked the horn button to find the car. G.G. was

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

very ill and taken to the hospital.  K.M. had a burn on his thigh which he attributed to a cup of noodles falling on him while he was wearing shorts.

1.  *Juvenile Proceedings Are Commenced on Behalf of K.M., T.G., and G.G.*

The Department took K.M., T.G., and G.G. into protective custody and filed section 300 juvenile dependency petitions on behalf of each of them.

Mother was present in custody at the April 2023 hearing on jurisdiction and disposition when the juvenile court sustained amended versions of the section 300 petitions as to T.G. and G.G.  K.M.'s matter was dismissed with an order granting his father Robert B. full legal and physical custody with mother to be afforded weekly supervised visits.  T.G. and G.G. (sometimes referred to herein as the older children) were adjudged dependents of the court and removed from parental care with provision of family reunification services.[2]

2.  *Reunification and Family Maintenance Services*

Family reunification services were continued at the December 2023 six-month review hearing.  By then, mother was no longer incarcerated and had one supervised visit with T.G. and G.G.

By the time of the 12-month review hearing in May 2024, mother had been visiting T.G. and G.G. since December 2023 and had started having overnight and

---

[2] Mother initially denied knowing who the fathers of T.G. and G.G. were but, by the time of the hearing on jurisdiction and disposition, D.G. was thought to be the father of both T.G. and G.G.  In May 2023, the Department reported that a court ordered paternity test established that D.G. was the father of G.G. but not T.G.  T.G.'s biological father was later found to be Tommie B.

weekend visits.  At the hearing, the juvenile court returned the children to mother's care with provision of family maintenance services.  The sole requirement of the maintenance plan was for mother to meet with the Department's social worker a minimum of once a month.  Family reunification services for father D.G. were terminated.

3. *The Department Takes G.G., T.G., and Newborn Baby Boy Into Protective Custody and Files a Section 300 Petition on Behalf of Baby Boy and Section 387 Petitions on Behalf of G.G. and T.G., and the Juvenile Court Orders the Children's Detention*

In November 2024, while the six-month family maintenance services review was pending, 23-month-old G.G. was hospitalized after he was discovered not only to have bruising, abrasions, cuts to his face, nose, and ears, but he was also lethargic, he was not sitting up, he was unable to intentionally move his arms and legs, and he was not responding verbally to his nurse.  In addition, he was severely dehydrated and suffering from anemia, thrombocytopenia, and Rhabdomyolysis (a serious medical condition that occurs when muscle tissue breaks down and releases proteins and electrolytes into the bloodstream—a condition that can cause death when left untreated).  Mother reported that G.G.'s cuts and abrasions were caused by his having fallen on some gravel.

On November 20, 2024, G.G.'s treating physician said mother's explanation was not consistent with the child's injuries.  Rather, his condition was consistent with multiple episodes of inflicted trauma, physical abuse, and severe neglect.  The doctor also reported that mother had been hospitalized and was going into labor.  The Department did not know mother was pregnant.

Mother gave birth to Baby Boy on November 20, 2024. The following day, the Department took T.G., G.G., and Baby Boy into protective custody. It filed section 387 supplemental petitions on behalf of the older children and a section 300 petition on behalf of Baby Boy. Tommie B. was named as the alleged father of Baby Boy.

On November 26, 2024, the juvenile court ordered the children detained. It ordered two-hour, twice a week supervised visits with G.G. and T.G for mother and father D.G., and weekly two-hour supervised visits with Baby Boy for mother and Tommie B. Mother, D.G., and Tommie B. were ordered to submit to random or same day drug testing and the Department was to provide predisposition services to mother and Tommie B.

4. *The Section 342 Subsequent Petitions*

In December 2024, the Department filed section 342 subsequent petitions on behalf of the two older children. G.G.'s petition alleged that he suffered severe physical harm and physical abuse because mother failed to seek medical care for him. T.G.'s petition alleged that Tommie B. should have known that mother failed to supervise and protect G.G., and that Tommie B. had an extensive criminal history that placed T.G. at risk of abuse or neglect.

5. *The Hearing on Jurisdiction and Disposition of the Sections 342, 387, and 300*
   *Petitions*

More than six months elapsed between the November 26, 2024 detention hearing and the June 2, 2025 orders on jurisdiction and disposition on Baby Boy's section 300 petition and the older children's sections 342 and 387 petitions. During that time, the Department reported that mother continuously tested positive for marijuana and other

5

times did not show up for tests, and that she refused to provide her home address to the Department. Tommie B. had tested positive for opiates in January 2025 and in February 2025 he tested positive for opiates, hydrocodone, and hydromorphone.

The Department reported that mother and Tommie B. were not visiting the children consistently, often missing visits by either not showing up, or cancelling, or arriving too late to participate.

In March 2025, the Department received reports that mother became frustrated with T.G. during a visit and she slapped him on the back. Nine days later, at another visit, mother was reported to have grabbed T.G. by his cheeks in a hostile manner. Mother also used vulgar language directed toward the visitation monitors and caregiver, and used foul language directed at the receptionist at the Department's office. The children appeared worried about mother's behaviors. The juvenile court admonished mother that the visit supervisor could terminate visits if there is suspected physical abuse or inappropriate language, and if the court received further information of violation of its orders, it would likely find mother's visits to be detrimental.

A February 2025 paternity test result had established that Tommie B. was T.G.'s biological father and, in April 2025, the court denied Tommie B.'s motion to be declared T.G.'s *Kelsey S.* father.[3]

---

[3] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 823, 849 [a biological father who promptly comes forward and demonstrates a full commitment to his parental responsibilities but is thwarted from becoming a presumed father because of unilateral actions of the child's mother may be declared the child's presumed father].

The Department reported that neither mother nor Tommie B. had participated in the predisposition services that had been offered to them.

Mother and Tommie B. were present at the June 2025 contested hearing on jurisdiction and disposition. The juvenile court sustained the sections 342 and 387 petitions as to the older children, continued them as dependents of the court, and removed them from mother. It sustained Baby Boy's section 300 petition, adjudged him a dependent of the court, and removed him from parental custody. Family reunification services for mother as to the older children were bypassed pursuant to subdivision (b)(5) and (6) of section 361.5, and services for mother as to Baby Boy were bypassed pursuant to subdivision (b)(6) and (10) of that section.[4] Services were not provided to Tommie B. on the grounds that he is a biological father, and it was not in the best interests of the children to offer services to him.

The court set a section 366.26 permanent plan selection hearing for all three of the children and each of the parents were advised of their right to seek review of the court's

---

[4] Section 361.5 subdivision (b) provides that the juvenile court need not provide family reunification services to a parent if it finds by clear and convincing evidence any of the circumstances set forth in that subdivision. As relevant here, those circumstances include: the child was brought within the jurisdiction of the court under subdivision (e) of section 300 (severe physical abuse of a child under the age of five) because of the conduct of that parent (§ 361.5 subd. (b)(5)); the child, a sibling, or a half-sibling have been adjudicated a dependent due to infliction of severe physical harm to the child, and the court finds that it would not benefit the child to pursue reunification services with the offending parent (§ 361.5 subd. (b)(6)(A)); and the court ordered termination of reunification services for any sibling or half-sibling after that parent had failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent in section 300 proceedings (see § 361, subd. (a)(1)), and the parent had not subsequently made a reasonable effort to treat the problems that led to the removal of that sibling or half-sibling (§ 361.5 subd. (b)(10)).

orders by way of a petition for an extraordinary writ. It authorized the parents to have supervised two-hour visits with the children at least once a month.

7. *The Permanent Plan Selection Hearing Resulting in This Appeal*

After the June 2, 2025 hearing on jurisdiction and disposition, mother attended one visit with the children before being arrested on June 30, 2025. In August 2025, a criminal protective order was filed in San Bernardino Superior Court prohibiting any form of contact between mother and the two older children but did not include Baby Boy. The order was to remain in effect until further court order.

Tommie B. and father D.G. were not present but mother appeared in custody at the November 3, 2025 contested permanent plan selection hearing. Tommie B. and father D.G. objected to termination of their parental rights but offered no affirmative evidence.

In response to mother's counsel advising the court that his client wished to testify, the court asked for an offer of proof because mother had not had any visits with the children since her incarceration in June. Counsel offered that mother had been visiting "up to the extent she had been allowed," that she did not have any visits after being incarcerated but that, prior to her incarceration, the children had been in mother's care for six months (apparently a reference to the May 2024 return of T.G. and G.G. to mother's care with family maintenance services until they were removed again in November 2024 because of the serious physical abuse of G.G.).

The juvenile court denied mother's request to give testimony, finding her testimony was not necessary for the court to make its decision and that her lack of visits over the prior four months as well as the criminal protective order prevented her from

8

establishing the *Caden C.* elements.  (*In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*).)[5]

After the court ruled on mother's offer of proof, counsel then argued that mother had a substantial positive relationship to T.G. and G.G. and that the benefit to those two children of continuing their relationship should be implied based on their living with mother prior to their removal.  Mother had told her counsel that she actively engaged with the children during visits, that they were very excited to see her at the beginning of the visits and that T.G. would throw tantrums when the visits ended.  Mother's counsel specifically excluded Baby Boy from her arguments, stating, "I'm not referring to the baby.  He was removed at birth."

The juvenile court found by clear and convincing evidence that the children are adoptable and terminated parental rights.

## DISCUSSION

On appeal, mother argues reversal of the order terminating her parental rights is called for because the juvenile court abused its discretion when it refused to grant her the opportunity to testify at the section 366.26 hearing.  She posits that, had she been

---

[5] *Caden C.* addressed the elements necessary to be established by a preponderance of evidence for a finding that a child comes within the beneficial parent-child relationship exception to termination of parental rights set forth in section 366.26, subdivision (c)(1)(B)(i).  (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.)  Those elements are that (i) the parent maintained regular visitation and contact with the child; (ii) the child has, and would benefit from continuing, a substantial, positive, emotional attachment to the parent; and (iii) termination of that relationship would be detrimental to the child even when balanced against the benefits of an adoptive home.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at pp. 636–637.)

permitted to testify, it "may very well have made a difference in meeting her burden" that she regularly participated in visitation enough to have G.G. and T.G. returned to her and further argued that the Department was not arranging visits with Baby Boy even though the juvenile court had ordered visits with that child. In other words, mother's claim is that, had she been permitted to testify, she would likely have been able to establish that she came within the beneficial parent-child relationship exception to termination of parental rights set forth in section 366.26, subdivision (c)(1)(B)(i). Tommie B. joins in mother's claim. We are not persuaded.

In cases like the present one in which family reunification efforts have failed and the court has found the children are likely to be adopted, the juvenile court is required to terminate parental rights unless the children come within the exceptions to termination set forth in subdivision (c) of section 366.26. (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.) As noted *ante*, one of those exceptions permits the selection of a permanent plan other than adoption if the parent has established by a preponderance of evidence three elements: (i) the parent maintained regular visitation and contact with the child; (ii) the child has, and would benefit from continuing, a substantial, positive, emotional attachment to the parent; and (iii) termination of that relationship would be detrimental to the child even when balanced against the benefits of an adoptive home. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at pp. 636–637.)

A parent is not automatically entitled to a contested evidentiary hearing to establish a section 366.26, subdivision (c) exception to termination of their rights. (*In re A.G.* (2020) 58 Cal.App.5th 973, 998 (*A.G.*).) A juvenile court may, as it did here,

request an offer of proof, and the parent's offer must provide specific evidence of the first two elements of the exception, to wit, regular visitation and the existence of a beneficial parent-child relationship. (*Id.*, at pp. 998, 1005.)

Mother's offer of proof fell well short of providing evidence of those two elements. As to regular visits, mother's counsel stated that mother "consistently" visited "up to the extent she had been allowed" before being incarcerated but that, after being incarcerated, she no longer had visits. As to the existence of a beneficial parent-child relationship, counsel offered only that mother had told counsel "the children" had been placed in her care for a little over six months (apparently referring to the period G.G. and T.G. had been returned to mother's care with family maintenance services in May 2024 and then removed in November 2024).

Mother's offer of proof did not provide evidence sufficient to warrant a hearing involving presentation of evidence, confrontation and cross-examination. Rather than providing specific evidence of regular visitation, the offer itself established that mother had not had any visits since June 2025 when she was incarcerated. Too, the fact that mother had G.G. and T.G. in her care for a six-month period that ended a year before the hearing did not establish the existence of a beneficial parent-child relationship at the time of the hearing particularly when it is considered that those children were very young during that stay with mother (G.G. was 23 months old and T.G. had turned three years old in August 2024 when the Department took them back into custody in November 2024). In view of the foregoing, we do not find that the juvenile court abused its discretion when

11

it found consideration of mother's testimony was not appropriate or necessary for it to make its decision.

Mother argues that the juvenile court abused its discretion because it bottomed its decision not to hear her testimony on the criminal court's protective order, which prohibits her from having contact of any kind with T.G. and G.G. She posits that the court found she was "ineligible" to make a showing that the parent-child relationship exception applied in her case because it treated the protective order as "automatically" establishing that her contact with the children is detrimental. Mother is mistaken.

First of all, in making its finding that mother had not maintained regular visitation and contact with the children, the court not only mentioned the protective order but also noted mother had not visited the children in four months. Moreover, it was not improper for the juvenile court to consider the criminal court's order prohibiting mother from having any contact with the children who were designated as victims of her criminal acts, an order that is issued only upon showing of a good cause that harm to, intimidation or dissuasion of a victim has occurred or reasonably likely to occur. (Pen. Code, § 136.2, subd. (a)(1).)

Mother's claims that her testimony "may very well have made a difference in meeting her burden" of establishing regular visitation and contacts because the Department's reports indicated that she "regularly participated in visitation enough to have [G.G. and T.G.] returned to her care," that it is "not in dispute" that she was in regular contact with children, and that the Department did not comply with the juvenile court's orders to arrange visits with Baby Boy. We disagree.

12

The record does not support the assertion that mother could have met her burden to establish that she maintained sufficiently regular visitation and contact with the children within the meaning of the parent-child exception to termination of parental rights. The facts that she participated in visits with G.G. and T.G. during five months of the 12-month reunification period and that the children were returned to her for six months cannot carry the day in view of subsequent events.

In November 2024—a year before the November 2025 permanent plan selection hearing—three-year-old T.G. and one-year-old G.G. were again removed from mother's home along with one-day-old Baby Boy when T.G. was found to have suffered nonaccidental injuries and medical neglect. After the children's November 2024 removal, mother's supervised visits were scheduled for two hours twice a week but within a few months, in January 2025, the Department reported that mother frequently failed to show up for visits and often arrived past the grace period. In March 2025 she cancelled a visit and failed to show up for two visits in April 2025.

At the June 2, 2025, hearing on jurisdiction and disposition on the sections 300, 342, and 387 petitions, the juvenile court reduced mother's supervised visits to two hours once a month. Mother had one visit on June 23, 2025. Seven days after that visit, on June 30, 2025, mother was arrested and was still incarcerated when the permanent plan selection hearing took place in November 2025. It is undisputed that she had no visits with any of the children since June 23, 2025.

Mother acknowledges that no visits with T.G. and G.G. took place after she was incarcerated because of the criminal court's protective order but complains that the

13

Department failed to arrange visits with Baby Boy, who was not covered by the protective order and suggests that, had the court permitted her to testify, she could have addressed that issue.

Even if mother had addressed that issue in her offer of proof, she could not prevail. Baby Boy was one day old when he was removed from mother's care and only seven months old when mother was arrested in June 2025, four months before the section 366.26 hearing. Even if the Department had been able to arrange for mother to have in-custody visits with Baby Boy once a month in keeping with the juvenile court's orders, four consecutive visits would not have cured her failure to maintain regular visitation and contact with him after he was removed in November 2024 and would not be sufficient to support a finding that he had developed, and would benefit from continuing, a substantial, positive, emotional attachment to mother as required for the parent-child exception to apply. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 636.)

## DISPOSITION

The juvenile court's orders terminating the parental rights of mother and Tommie B. with respect to T.G., G.G., and Baby Boy are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

CODRINGTON
J.